THE BANK OF ATLANTA V. F. L. FRETZ ET AL.

No. A-2314. Decided January 11, 1950.
Rehearing overruled March 1, 1950.
(226 S. W., 2d Series, 843.)

*Lawler & Childress* and *Virgil Childress,* all of Houston, for petitioner.

It was error for the Court of Civil Appeals to hold that respondent F. L. Fretz fully complied with all provisions of the Texas motor vehicle Certificate of Title Act and thereby acquired good title to the automobile in controversy free and clear of petitioner's valid chattel mortgage lien against it. It was also error for said court to hold that respondent Sweiven ac-

quired good title to the automobile in controversy, free and clear of petitioner's lien thereon. Ball Bros. Trucking Co. v. Sorenson, 191 S. W. (2d) 908; Dublin National Bank v. Chastain, 167 S. W. (2d) 795, writ of error refused; Commercial Credit Co. v. American Mfg. Co., 155 S. W. (2d) 834, writ of error refused.

*Nat Friedman,* of Houston, for respondent.

In reply to the proposition of petitioner cite Consolidated Garage Co. v. Chambers, 111 Texas 293, 231 S. W. 1072; Transcontinental Freight Co. v. Packard North Texas Motor Co., 11 S. W. (2d) 362.

MR. JUSTICE SHARP delivered the opinion of the Court.

This case involves the construction of the Acts of 1939, 46th Legislature, page 602, as amended by the Acts of 1941, 47th Legislature, page 343, and the Acts of 1943, 48th Legislature, page 404, and the Acts of 1947, 50th Legislature, pages 168, 251, 284, 452, 544, and 1008, known as the "Certificate of Title Act," and now Article 1436-1, Vernon's Texas Statutes 1948, Penal Code.

This suit was brought by The Bank of Atlanta, of Atlanta, Georgia, against F. L. Fretz, C. E. Sweiven, and W. N. Harris, for recovery on a note executed in its favor by W. N. Harris, and for the foreclosure of a chattel mortgage lien on a 1948 Studebaker Sedan. Defendants answered by general denial, and by special plea alleged that each of them had purchased the automobile in good faith and for a valuable consideration, after having received a proper certificate of title from the owner, and without having any knowledge or information that any lien existed against it at the time of the purchase. In the trial before the court without a jury, judgment was rendered in favor of plaintiff and against W. N. Harris for the debt sued for, with interest. The court denied foreclosure of plaintiff's lien against the automobile in controversy, and vested the title thereto in defendant Sweiven free and clear of the liens and claims asserted by plaintiff. From this judgment plaintiff appealed to the Court of Civil Appeals, and the judgment of the trial court was affirmed. 221 S. W. (2d) 297.

The material facts as found by the trial court are as follows:

1. On or about December 11, 1947, W. N. Harris purchased from Cherokee Motors, Inc., in the town of Decatur, State of

Georgia, a new 1948 Studebaker Champion 4-door Sedan, for a total purchase price of $2,021.03, the full amount of which he paid in cash and property at the time said automobile was delivered to him.

2. On or about December 12, 1947, in the City of Atlanta, Georgia, W. N. Harris, for a valuable consideration, executed and delivered to The Bank of Atlanta a bill of sale and chattel mortgage covering the above-described automobile, to secure his promissory note dated December 12, 1947, in the principal sum of $1,224.00, payable in five monthly installments of $200.00 each.

3. The bill of sale and chattel mortgage were duly filed for record in compliance with the laws of Georgia, in the office of the Clerk of the Superior Court of Fulton County, Georgia, on December 13, 1947, and recorded on December 18, 1947; and under the laws of the State of Georgia, The Bank of Atlanta acquired a good and valid chattel mortgage lien against the automobile.

4. Thereafter, without the knowledge or consent of The Bank of Atlanta, W. N. Harris transported said motor vehicle to Houston, Texas, and on December 29, 1947, in the name of W. N. Harris doing business as P. & H. Motor Company, he applied to the Tax Collector of Harris County, Texas, for a certificate of title, representing that there were no liens existing against said motor vehicle. On the same day, W. N. Harris sold the automobile to F. L. Fretz, doing business as F. L. Fretz Motor Company, for a total consideration in excess of $2,000.00, and W. N. Harris executed and delivered to F. L. Fretz an assignment of the application for a certificate of title to the automobile.

5. At the time of his purchase of the automobile, F. L. Fretz had no actual knowledge of the fact that it was then subject to the chattel mortgage lien securing the above-described $1,224.00 note then owing to The Bank of Atlanta by W. N. Harris. Fretz did know that Harris was, or purported to be, a resident of the City of Atlanta, Fulton County, Georgia, but Fretz, prior to the purchase of the automobile, made no inquiry of the County Clerk of Fulton County, Georgia, to ascertain whether the automobile was subject to any recorded liens.

6. On the same day of the purchase, December 29, 1947, F. L. Fretz, doing business as F. L. Fretz Motor Company,

applied to the Tax Collector of Harris County, Texas, for a certificate of title to the automobile, representing that there were no liens existing against it.

7. On January 15, 1948, a certificate of title was issued by the Texas Highway Department to F. L. Fretz Motor Company, in accordance with the application therefor filed by Fretz on December 29, 1947.

8. Thereafter F. L. Fretz, doing business as F. L. Fretz Motor Company, duly sold, assigned, and transferred the automobile to C. E. Sweiven, representing that there were no liens existing against it; and on February 25, 1948, a certificate of title was issued to C. E. Sweiven by the Texas Highway Department. The automobile is now in the possession of C. E. Sweiven.

9. At the time of his purchase of the automobile from F. L. Fretz Motor Company, C. E. Sweiven had no actual knowledge that the automobile was then subject to the chattel mortgage lien securing the note of $1,224.00 then owed by Harris to The Bank of Atlanta.

10. On February 2, 1948, The Bank of Atlanta first learned that Harris had transported the car from the State of Georgia, and on the same day it first learned that Harris had sold the car to Fretz in Houston, Texas, and at which time Fretz and his purchaser were then in possession of the vehicle in accordance with the Title Certificate Laws of the State of Texas.

11. Fretz purchased the automobile from Harris in good faith and for a valuable consideration, and the sale was consummated in Houston, Texas, by a bill of sale which Harris had executed in proper form.

12. No Certificate of Title Act of any kind is in force in the State of Georgia, and none was in force at the time of any of the aforesaid transactions.

The bill of sale from Cherokee Motors, Inc., to Harris covering the motor vehicle was executed in Decatur, DeKalb County, Georgia, and gives Harris' address as 1132 Peachtree Street, Atlanta, Georgia. Harris executed the chattel mortgage to petitioner in the county of his designated address. There was nothing to prevent Fretz or anyone else from seeing Harris' address which was typewritten on the bill of sale.

The Court of Civil Appeals found that the vehicle purchased by Harris was a used car, transported into Texas for sale, and that its sale by Harris to Fretz was a subsequent sale; that Harris and his purchaser, F. L. Fretz, applied for title certificates on forms prescribed by the Highway Department, showing that there were no liens against the vehicle, as was disclosed by the affidavit presented to the Tax Collector of Harris County. That court found that it was undisputed in the record that Harris did not execute and deliver to the Tax Collector an importer's certificate, as required by Section 29 of the Act, but furnished only a bill of sale showing that he was the owner of the vehicle, and that the bill of sale received by him in Georgia did not show a lien against the automobile; that the record discloses that the certificate of title issued to Fretz upon the application of Harris contained the false and fraudulent statement that there were no valid liens against the automobile, and that the issuance of the certificate of title constituted a fraud against the Bank, it being undisputed that no Certificate of Title Act of any kind was in force in Georgia at the time of any of the transactions involved in this appeal. However, the Court of Civil Appeals affirmed the judgment of the trial court, citing in support of its decision Consolidated Garage Co. v. Chambers, 111 Texas 293, 231 S. W. 1072, and Farmer v. Evans, 111 Texas 283, 233 S. W. 101, and other cases in harmony with those cases.

The controlling question presented here is whether petitioner, who is the holder of a valid chattel mortgage on an automobile which was acquired in the State of Georgia, where the automobile was purchased, and which State has no certificate of title law, is entitled to enforce its mortgage lien on the automobile, which has been surreptitiously removed to Texas without the knowledge or consent of petitioner, and where a certificate of title has been obtained on false and fraudulent representations that no lien existed against the automobile, the automobile now being in the hands of an innocent purchaser who acquired same for value without notice.

Articles 5490, 5497, and 5497a of Vernon's Annotated Civil Statutes deal with the registration of chattel mortgages on personal property, and provide the method necessary to place a lien thereon. In 1921 this Court, in construing Articles 5654 and 5655 of the Revised Civil Statutes, now Articles 5489 and 5490, as amended, of Vernon's Annotated Civil Statutes, held in Consolidated Garage Co. v. Chambers, 111 Texas 293, 231 S. W. 1072, and in Farmer v. Evans, 111 Texas 283, 233 S. W.

101, that where mortgaged property was removed to the State of Texas from another State, and was purchased by an innocent purchaser in this State, the owner of the mortgage lien was not protected, although the mortgage had been duly filed for record and was valid in the State where it was given.

To support the rule announced by this Court in the Chambers case, the case of Snyder v. Yates, 112 Tenn. 309, 79 S. W. 796, 64 L. R. A. 353, 105 Amer. St. Rep. 941, was cited. The Snyder case was expressly overruled in Newsum v. Hoffman, 124 Tenn. 369, 137 S. W. 490, and that court approved the rule supported by the great weight of authority. Louisiana and Michigan also followed the minority rule, but in 1940 the Supreme Court of Louisiana reconsidered the question and adopted the majority rule, in view of the enactment of the Chattel Mortgage Act of 1936 (See General Motors Acceptance Corporation v. Nuss, 195 La. 209, 196 So. 323), and in 1941 the Supreme Court of Michigan, in an exhaustive opinion reviewed the decisions, reconsidered the question, adopted the majority rule, and overruled a long line of decisions. See Metro Plan, Inc., v. Kotcher-Turner, Inc., 296 Mich. 400, 296 N. W. 304. The rule in the Chambers case has been criticized and not followed by some courts in this State. Ball Bros. Trucking Co. v. Sorenson, Tex. Civ. App., 191 S. W. (2d) 908.

■ It is undisputed that the rule announced by this Court in the case of Consolidated Garage Co. v. Chambers and Farmer v. Evans, supra, constitutes the minority doctrine, which is described in many textbooks as the "Texas doctrine," and that the great weight of authority sustains the rule announced by the courts of other jurisdictions. See 14 C. J. S., Chattel Mortgages, p. 607, sec. 15, 10 Amer. Jur., p. 729, sec. 21; The Conflict of Laws, by Beale, Vol. 2, p. 997, sec. 268.2; Restatement of the Law, Conflict of Laws, p. 353, sec. 268; Michigan Law Review, Vol. 41, p. 445 et seq.; Harvard Law Review, Vol. 40, p. 805. In 14 C. J. S., Chattel Mortgages, p. 607, sec. 15, the majority rule is stated as follows:

"The weight of authority is to the effect that a mortgage, properly executed and recorded according to the law of the state where the mortgage is executed and the property is located, will, if valid there, be held valid even as against creditors and purchasers in good faith in another state to which the property is removed by the mortgagor, unless the transaction contravenes the statute or settled law or policy of the forum; * * *." To sustain the foregoing rule the decisions of 23 other jurisdic-

tions are cited in the footnotes. In support of the Texas rule, the decisions of Louisiana and Pennsylvania are cited. As stated above, Louisiana has since adopted the majority rule.

In some jurisdictions the enforcement of a chattel mortgage lien rests upon the rule of comity or reciprocity. The case of Union Securities Co. v. Adams, 33 Wyo. 45, 236 P. 513, 517, 50 A. L. R. 23, involved a contest between a bona fide purchaser of an automobile in Wyoming, after its surreptitious removal from Texas, and a Texas mortgagee holding a prior lien on the automobile. The Supreme Court of that State, while approving the rule sustained by the great weight of authority, denied enforcement of the lien acquired in Texas, because the Texas doctrine was not in harmony with the decisions of other States and denied the enforcement of liens acquired according to law in other States under similar conditions. On the other hand, the more recent decisions indicate a tendency to disregard the rule of comity and enforce the lien. See Hart v. Oliver Farm Equipment Sales Co. (Thompson), 37 N. M. 267, 21 P. (2d) 96, 87 A. L. R. 962, and cases cited therein. See also authorities collected in the notes in 50 A. L. R., p. 30, 57 A. L. R., p. 702, and 87 A. L. R., p. 973.

The legal history connected with chattel mortgages on automobiles is well known. At the outset travel by automobile was slow, and the system of filing and recording mortgages on automobiles was simple and effective. But as time progressed the automobile was improved and its velocity so increased that it was soon possible to cover many miles and cross into many States in a very short time upon the great highways extending into all parts of the country. In the full development of the automobile the commercial world has been presented with a chattel which is capable of easy and rapid movement from market to market and from jurisdiction to jurisdiction. The automobile industry has become an immense commercial enterprise. The opportunities for fraud are quite obvious, for as a rule from the time it is first bought until it is junked an automobile changes hands many times. To meet the situation and to afford better protection to lienholders and innocent purchasers, a majority of the States have certificate of title acts in some form. Other States are adopting certificates of title acts, and those States which already have such acts are constantly amending them to make them more effective. The legislatures of the States on the whole seem to be conscious that legislation of this kind is necessary to properly deal with the problems resulting from the sale and resale of automobiles.

The great weight of authority which now conflicts with the rule announced by this Court in 1921 in the cases cited above, the radical changes in conditions relating to the use of automobiles within recent years, and the enactment of Article 1436-1 of the Penal Code, are new factors which furnish a fresh standpoint from which to examine the important question presented to us in this case.

In 1939 the Legislature enacted the "Certificate of Title Act," which has been amended as indicated above, and is now Article 1436-1, Vernon's Texas Statutes, 1948, Penal Code. The Act deals with motor vehicles only, and its scope and purpose are disclosed in the many sections thereof and in the emergency clause.

Section 1 of Article 1436-1 of the Penal Code in part reads.

"This Act shall be referred to, cited and known as the 'Certificate of Title Act,' and in the enactment hereof it is hereby declared to be the legislative intent and public policy of this State to lessen and prevent the theft of motor vehicles and house trailers, and *the importation into this State of, and traffic in, stolen motor vehicles and house trailers, and the sale of encumbered motor vehicles and house trailers without the enforced disclosure to the purchaser of any and all liens for which any such motor vehicle or house trailer stands as security,* and the provisions hereof, singuarly and collectively, are to be liberally construed to that end." (Emphasis ours.)

■ Article 1436-1 of the Penal Code relates to certificates of title to automobiles, and repealed and superseded those parts of the Chattel Mortgage Registration Statutes expressed in Articles 5490, 5497, and 5497a, Vernon's Texas Civil Statutes, 1948, so far as they affected the registration of chattel mortgage liens on automobiles. Commercial Credit Co. v. American Mfg. Co., 155 S. W. (2d) 834, Tex. Civ. App., writ refused. In the case of Motor Inv. Co. v. City of Hamlin, 142 Texas 486, 179 S. W. (2d) 278, this Court specifically referred to the holding in the case just cited, approved same, and also stated that for the same reason stated in that case the Article involved repealed provisions of Articles 4000 and 5497, Vernon's Texas Civil Statutes, 1948, in so far as they pertain to such motor vehicles.

The view we take of this case makes it unnecessary to discuss the many sections of this Act. The Act prescribes the steps to be taken for fixing liens upon motor vehicles. Its obvious

purpose is to cover the field of sales and liens upon motor vehicles in this State. A person desiring to fix a valid lien on a motor vehicle sold in this State must have the lien endorsed on the certificate of title issued in this State. If through the fault or negligence of the lienholder this is not done, the lien cannot be enforced against a motor vehicle in the hands of an innocent purchaser for value. The State of Georgia does not have a certificate of title law, and consequently those who take liens on motor vehicles in that State must follow the method pursued by petitioner in this case. The facts of this case present the precise question whether the issuance of the certificate of title by the Texas authorities destroyed the lien held by petitioner as against liens subsequently acquired in Texas. Petitioner had fully complied with the laws of Georgia, where the car was purchased by Harris. It had no way of knowing that Harris would surreptitiously remove the car from Georgia and bring it to Texas, where he would falsely and fraudulently represent that no liens existed against the motor vehicle, in order to obtain a certificate of title thereto and sell it to someone else who could claim to be an innocent purchaser for value.

Article 1436-1, Vernon's Texas Statutes, 1948, Penal Code, was enacted for the protection of the public, and the provisions thereof are to be liberally construed to effectuate the purpose for which it was enacted. One of its chief objectives was to lessen and prevent the importation into this State of, and traffic in, stolen motor vehicles, and to prevent the sale of encumbered motor vehicles without the disclosure to the purchaser of any and all liens for which any such motor vehicle stands as security.

■ The spirit and purpose of this law is to prevent fraud; not to encourage it. It was not the intention of the Legislature by this Act to invalidate liens validly acquired in States which do not have a similar law, and this is especially true in the event a vehicle covered by a lien is wrongfully, without the knowledge or consent of the lienholder, removed from the State where the lien was acquired and brought to this State, and the owner by false and fraudulent representations obtains a certificate of title showing that no lien exists against the vehicle, so that he is thereby enabled to transfer the vehicle to an innocent purchased for value without notice of the lien. If the Legislature had intended this, it could have stated that all liens acquired in other States not having certificate of title laws would be forfeited when the vehicle reaches the hands of an innocent purchaser for value in this State.

If the State of Georgia had had a certificate of title law, it would have been the duty of petitioner to see that its lien was endorsed on the certificate of title issued in that State. Because the State of Georgia does not have such a law, valid liens acquired in that State should not be destroyed by dishonest methods, such as that practiced by Harris in this instance to obtain a certificate of title in Texas.

The principles of fairness and commercial expediency support the rule that protects a mortgagee who holds a valid lien, which was acquired in another State, on a vehicle wrongfully removed from the State where the lien was acquired and brought into this State without the consent or knowledge of the mortgagee. Stumberg, in his Conflict of Laws, page 366, says:

"A majority of the courts feel that preference should be given the conditional vendor or mortgagee when the chattel is wrongfully removed from the state where it was originally sold and the law there has been complied with, because they think that it is better social policy to protect him against a person, who, although he is innocent, is claiming title through a wrongdoer whose wrongful act is beyond the effective control of the vendor or mortgagee."

Section 38 of this Act provides that the Highway Department may suspend or revoke a certificate of title if the application contains any false or fraudulent statement, or if the applicant fails to furnish required information, and it may refuse to issue a certificate of title if the applicant is not entitled to same.

Petitioner acquired its lien in accordance with the laws of Georgia, and the undisputed facts of this case present no sound reason, in the light of the Act involved, for denying the enforcement of petitioner's lien in this State.

The trial court and the Court of Civil Appeals erred in denying the enforcement of petitioner's lien. The judgments of those courts are reversed, and the case is remanded to the District Court with instructions to enter judgment for petitioner enforcing its lien, and to make such further order, or orders, as may be proper, consistent with this opinion.

Opinion delivered January 11, 1950.

Rehearing overruled, March 1, 1950.