### CRAWFORD UNDERTAKING CO., Inc. v. HERMAN SIEGEL, Inc.

No. 2898.

Court of Civil Appeals of Texas. Waco.

May 11, 1950.

Rehearing Denied June 8, 1950.

W. J. Durham, Dallas, for appellant.

Spafford & Spafford, Leslie Jackson, Thompson & Barrett, all of Dallas, for appellee.

TIREY, Justice.

Herman Siegel, Inc., a California corporation, recovered judgment in the sum of $661.00 with interest and costs (nonjury) against Crawford Undertaking Company, a Texas corporation, domiciled in Dallas, Texas. Defendant duly excepted and perfected its appeal. There was no request for findings of fact and conclusions of law and none were filed.

The judgment is assailed on five points. They are in effect: (1, 2 and 3) that it has no support in the pleadings, nor is it supported by competent evidence; (4) the court erred in admitting declarations made by Sholars not in the course of the negotiations to which such declarations referred, nor within the scope of Sholars' authority;

(5) the court erred in admitting testimony of the witness Thompson as to certain. declarations alleged to have been made by the witness Sholars to Thompson long after the alleged transaction relating to the burial of James Bishop and for that reason such declarations were hearsay and not binding upon appellant.

Appellant has discussed these assignments together and they are so inter-related that we shall do likewise.

Plaintiff alleged substantially that it was in the retail jewelry business; that on the 28th of October, 1946, it entered into a conditional sales contract with James Bishop, a resident of Los Angeles, California, wherein it sold to Bishop a diamond ring fully described at a price of $900.00 and for which Bishop agreed to pay the sum of $15.00 weekly until fully paid. It attached a copy of the conditional sales contract to the petition; that about May 15, 1947, James Bishop came to Dallas for a visit and a few days after he reached Dallas he died; that at the time of Bishop's death he owed plaintiff a balance of $661.00 on the ring; that immediately after the death of Bishop the ring was transferred and possession thereof given to defendant; that defendant took the ring and held it as guaranty or surety for Bishop's funeral bill; that at the time the ring was delivered to the funeral home Bishop had no title other than a conditional one; that it immediately demanded possession of the ring from the funeral home because of its claim to title by virtue of its conditional sales agreement; that default having been made in the payment of the purchase price of the ring and the plaintiff being informed that defendant had taken possession of said ring, plaintiff, through its agent, notified defendant on June 9, 1947 that title to the ring was vested in it and demanded possession of the ring; that it demanded possession again on June 16, 1947; that defendant admitted it had the ring but refused to give plaintiff possession, to which it was legally entitled; that by reason of defendant's failure to deliver possession of the ring to plaintiff defendant became liable and bound to plaintiff in damages in the amount of the balance due and owing on the ring, which plaintiff alleged was $661.00, and prayed that it recover judgment for such sum.

Pertinent to this discussion defendant averred substantially that it did not have information sufficient to deny or admit the plaintiff's allegations as to the sale of the ring to the deceased, nor its allegations as to reservation of title, nor its allegations as to the amount due and owing on the ring by deceased, and put the plaintiff to its proof as to these allegations. It further denied generally all of the remaining allegations. It further specially denied that the ring in question was ever transferred or tendered to it and that it had never been held by the defendant as security for James Bishop's funeral bill, and it further specially pleaded that the ring had never been in its possession; that no demand had ever been made upon it and it had never refused to deliver the ring because it had never been in its possession.

The sales contract tendered in evidence provides in part: "This is to certify that I have purchased from Robbins in Los Angeles, California, merchandise of the agreed value of $900.00, for which I hereby agree to pay $15.00 per week on the 2nd day of November, 1946, and the further sums of $15.00 each succeeding week hereafter until said sum, together with the purchase price of all other merchandise which I may hereafter purchase, is paid in full. All payments are to be made at the place of business of Robbins." Robbins was the trade-name under which the corporation did business.

Plaintiff tendered its witness Charles Lewis, who testified in part to the effect that he was formerly credit and collection manager of the plaintiff; that while he was so employed he received a letter on June 9, 1947 from a brother of James Bishop advising it of the death of James Bishop; that on the same day he called deceased's widow by long distance telephone in Dallas and in the conversation she stated that the diamond ring which her deceased husband had purchased from Robbins had been delivered to the Crawford Undertaking Company in Dallas to secure the payment of bill for funeral services for

James Bishop. "I told Mrs. Bishop that the diamond ring had not been paid for, and belonged to Robbins and she told me to get in touch with the funeral parlor, if Robbins was demanding return of the ring. I then called Crawford Undertaking Parlors. I told the man who spoke to me that I had just talked to Mrs. James H. Bishop in Dallas, Texas, and she told me her husband had died and that the Crawford Undertaking Parlors was going to conduct the funeral and burial of Mr. Bishop and that they had in their possession the diamond ring which her husband had purchased from Robbins. I informed him that the ring belonged to Robbins—that it had been purchased on a title retaining contract and had not been paid for and that we were demanding the return of the ring. I was told by the man who spoke to me that a diamond ring had been taken from the hand of the deceased, James H. Bishop, but he refused to state whether the ring would be returned to Robbins or deceased's family or what disposition would be made of it." This witness further testified to the effect that the value of the ring in question in June 1947 was $750.00 and that there was a balance due and owing on the ring of $661.00. The witness did not know the name of the man with whom he talked at the Crawford Undertaking Company, but the man with whom he talked stated that he was talking for the Crawford Undertaking Company. (Sholars, the general manager of the company, admitted that he had a conversation with the party in California about the Bishop ring.)

Capitola Bishop, called by plaintiff, testified in part to the effect that she was the wife of James Bishop, deceased; that he came to Dallas in May 1947 and died on May 27th, after having been in Dallas approximately seventeen days. She further testified:

"Q. (By Mr. Jackson): Well, now, let's go back to this conversation you and I had two days ago. What was it you told me about a jewelry house out in California phoning you? A. I told you that about a month after my husband passed a jewelry company called and wanted to charge the call collect and wanted to talk to me. However, I didn't know at that time it was a jewelry company; it was just a man gave his name, so I didn't accept the call, so maybe three or four days later the jewelry company called me and asked about the ring, and I told them the Crawford Undertaking Company had the ring—that was, Mr. Sholars had the ring—

"Q. In other words, the jewelry company called and you have just stated that you told them the Crawford Undertaking Company had the ring? A. I said Mr. Sholars had the ring, and he said, 'Where is Mr. Sholars' and I said, 'With Crawford Undertaking Company.'

"Q. Mr. Thompson got in touch with you too, didn't he? * * *

"Q. What did he say? A. He wanted to know something about the transaction. I didn't tell him anything because—

"Q. You told him to take it up with the Crawford Undertaking Company, didn't you? A. Take it up with Mr. Sholars.

"Q. Mr. Sholars was with the Crawford Undertaking Company, was he? A. Yes, sir."

While Capitola Bishop was on the witness stand she identified three instruments tendered in evidence, which were assignments of insurance policies, to the defendant; one for $500.00, one for the sum of $150.00, and the third assignment covering two policies in the amounts of $232.00 and $216.00 respectively. Each of these assignments was dated May 27, 1947, and there was collected on these four policies a total of $1,098.00, out of which Capitola Bishop paid the funeral bill of her husband in the sum of $466.50. A check, No. 381, was drawn by defendant on the Mercantile National Bank of Dallas under date of June 10, 1947, payable to Mrs. Capitola Bishop for the sum of $183.50. It was signed by A. A. Braswell, Executive Vice-President, and Scipio Sholars, General Manager. This check was tendered in evidence and photostatic copy of the same appears in the Statement of Facts. The deceased's widow further testified she received another check, No. 393, for the sum of $446.80, but this check was not tendered in evidence; however, the witness identi-

fied a receipt introduced in evidence, dated the 16th day of June, 1947, in the sum of $446.80, which stated: "Received of Crawford Undertaking Company cash in the amount of $446.80 in return for check in the sum of $446.80 made in favor of Crawford Undertaking Company and Mrs. Capitola Bishop, issued by Atlanta Life Insurance Company on the life of James Bishop, deceased. (Signed) Mrs. Capitola Bishop." She further testified to the effect that the check for $183.50 and the cash receipt of $446.80 represented the balance due and owing to her after the funeral expenses were paid out of the $1098.00 collected on the insurance policies. She further testified to the effect that after she had made the assignments of the insurance policies on the 27th of May 1947 to the Undertaking Company that she delivered the ring to Sholars, and testified to the effect that she sold the ring for $200.00; that he had paid her $170.00 and owed her $30.00 at the date of the trial. She further testified to the effect that when she went to the Crawford Funeral Home to make the funeral arrangements that her sister was with her; that Mr. Sholars was there; that he showed her the caskets and that as he would show her the caskets he would tell her the price of each, and she made her selection, and that all of her transactions were with him.

The Hon. Chas. Thompson of the Dallas Bar and one of counsel for plaintiff in this behalf testified in part to the effect that plaintiff placed its claim with him on June 16, 1947; that on the same day he wrote defendant a letter concerning the claim and received no reply; that on June 20th he called the defendant over the telephone and asked for the manager and the person answering the telephone called some one to the telephone who stated that his name was Sholars and that he was the general manager of the Crawford Undertaking Company, and in this conversation Sholars said to him, "We have the ring and are holding it for the funeral bill", and he (Thompson) said the ring didn't belong to Bishop; it belonged to the Robbins Company in California; that he made demand for the ring and defendant refused to surrender it.

Sholars was placed on the stand by plaintiff and he testified in part to the effect that he was in the employ of the defendant at the time that James Bishop's body was delivered to the Undertaking Company for burial, and that after the burial, the exact time he did not remember, some one called him over long distance telephone from California and he said he told them in the conversation, "I am holding the ring. I can't remember whether I told them I was holding it for the burial of James Bishop." He stated that he didn't deliver the ring to anybody and that he didn't keep it for the Crawford Undertaking Company; that some one from California telephoned him after the burial of James Bishop, but he didn't remember just how long afterwards; that they discussed with him the matter of the ring.

"Q. And you told them you had the ring. A. Yes, sir.

"Q. And told them you were holding it for a lien for the burial expenses of James Bishop, did you not? A. I wouldn't remember just exactly.

"Q. That was about the conversation, wasn't it? A. I imagine it was concerning the ring.

"Q. I know, but you were holding the ring and they asked you why you were holding the ring, did they not? A. I couldn't remember the exact conversation.

"Q. Not the exact conversation, but you told them you were holding the ring and they wanted to know why you were holding the ring, did they not? A. I talked to them about the ring, but as to the exact conversation, I couldn't say.

"Q. Well, you talked with them about the ring, did you not? A. I talked with them concerning it.

"Q. Well, 'concerning it.' All right. And you told them you were holding the ring, did you not? A. Yes, I told them I was holding it.

"Q. And they asked you why you were holding it, did they not? A. I can't remember the conversation.

"Q. And you told them you were holding it for the burial expenses of James

Bishop, did you not? A. I can't remember.

"Q. Well you won't say you didn't tell them that, would you? A. I can't remember the conversation.

"Q. But you were the one that answered the phone and talked to them? A. I talked to them."

Sholars further testified:

"Q. What were your duties with the Crawford Undertaking Company? A. Making funeral arrangements, directing funerals, and seeing that they were carried out properly. * * *

"Q. Generally, what were the funeral arrangements you made? A. Generally, the funeral arrangements I made consisted of selling caskets and making the necessary arrangements for the funeral—everything pertaining to it. * * *

"Q. In other words, if they had insurance you would make arrangements for the assignment of the insurance; is that the way you handled it? A. That all came in the scope of funeral arranging."

A. A. Braswell, tendered as a witness for defendant, testified to the effect that he was vice-president and secretary of the defendant company; that Bishop was buried on May 30, 1947; that he collected the funeral bill for the burial of James Bishop, deceased; that the money was paid on the policies assigned by Capitola Bishop and when the money was collected it was placed in the bank account of the Crawford Funeral Home and that the money paid to Capitola Bishop was paid to her by checks drawn on the bank account of the Crawford Funeral Home; that the two checks given to Capitola Bishop reflected the balance after the funeral expenses of James Bishop were paid; that the funeral arrangements were paid by Capitola Bishop, and that he did not make the arrangements for the funeral.

At the conclusion of the evidence defendant filed a written motion requesting the court in effect to render judgment in favor of defendant on the pleadings and the evidence, which motion stated in effect that the evidence was undisputed that the only parties who had the ring in question in

their possession were Sholars and Capitola Bishop, and the undisputed evidence tendered is to the effect that the funeral expenses were paid to Crawford Undertaking Company by the surviving wife, Capitola Bishop, out of insurance policies assigned by the widow to the defendant, and that no bill or funeral expenses were paid by the delivery and transfer of the ring to Crawford Undertaking Company and that there was no evidence that any one acting for Crawford Undertaking Company ever received or accepted the ring as the property of the Crawford Undertaking Company, or for any other purpose, and further because the evidence is undisputed that Capitola Bishop, the widow, sold the ring to Sholars. The trial court overruled this motion and granted judgment for plaintiff.

■ The question therefore arises: Did the court err in entering such judgment? We think not. Sholars was an adverse witness under Rule 182, T.R.C.P. We think defendant's testimony fails to meet the test announced in Dunlap v. Wright, Tex.Civ.App., 280 S.W. 276, point 6, page 279. Nor did defendant, by proper pleading, set up that if Sholar had received and accepted the ring as security for the funeral bill of James Bishop that it was without its knowledge and consent and that its position was that of a "stakeholder" and ask for appropriate relief. Moreover, it is well settled that a mortgagee in Texas has the right to sue a third party for conversion of mortgaged property. In 9 Tex.Jur. 172 we find this statement of the rule: "When mortgaged property has been wrongfully appropriated by another, the mortgagee has the choice of two remedies: he may seek his foreclosure as against the claimant or wrongdoer, or he may waive his lien and sue for the conversion. He must elect his remedy. If he elects to rely on the conversion, he waives the lien and his remedy is an action for damages. He cannot have both remedies as they are inconsistent. If he seeks damages, his right is to recover his loss. This ordinarily means the amount of the debt, since the property secures the debt and is supposed to be sufficient therefor. But this is not necessarily the amount of

his recovery. The property may not equal in value the debt, and his loss in that case would ordinarily be the value of the security converted with interest. Thus the general rule is that the amount of recovery is the value of the thing converted, not, however, to exceed the debt * * *."

In Oats v. Dublin Nat. Bank, 127 Tex. 2, 90 S.W.2d 824, 827, the Commission of Appeals, opinion adopted by the Supreme Court, said: "A mortgagee may maintain an action of trover on account of the conversion of mortgaged property. Usually such action is against the mortgagor and the purchaser and they are jointly liable to the mortgagee. Anyone, however, who is instrumental in the disposition of the property in denial of a mortgagee's right, or who causes or induces such disposition of the property, may be held by the mortgagee for conversion." See points 2–4, p. 827 of 90 S.W.2d 824, for collation of authorities. Our Supreme Court has never departed from the doctrine there announced.

Since the trial court found that the facts and the law were with the plaintiff, we must assume that he impliedly found that Capitola Bishop had placed the ring with the defendant as security for the funeral bill and that it was holding the ring as such at the time of the telephone conversation on June 9th. Since the evidence is without dispute that the Undertaking Company had collected monies on the insurance policies in the amount of $1,098.00 and had the proceeds in its possession or under its control at the time of the telephone conversation on June 9, 1947, out of which it accepted full payment of the funeral bill of James Bishop, we think the defendant's possession of the ring was wrongful against the plaintiff's claim of title and for possession, and defendant was not entitled to hold the ring in its possession against plaintiff's demand. Our view is that the factual situation here made brings this case within the foregoing rule.

As we understand appellant's position, it is to the effect that no competent evidence of probative force was tendered sufficient for the trial court to find impliedly that the defendant Undertaking Company had received the ring and was holding the same as security for the funeral expense at the time plaintiff made or caused to be made a demand for the ring to be returned to it, and further contends that plaintiff made no demand for the ring. We do not share this view. We have examined very carefully all of the testimony tendered in this cause and we think that the evidence is sufficient to sustain each implied finding necessary to support the judgment of the trial court. Since the judge was the trier of the fact issues, he stood in the same relation to the case as a jury. He was the judge of the credibility of the witnesses and the weight to be given to their testimony and we think the rule of law applicable is stated clearly in Continental Fire & Cas. Ins. Co. v. Drummond, Tex. Civ.App., 220 S.W.2d 922, points 1–4, p. 924, and authorities there collated. See also Worth Finance Co. v. Charlie Hillard Motor Co., Tex.Civ.App., 131 S.W.2d 416.

Appellant further contends in effect that since the testimony is without dispute that Bishop died on May 27th and that the insurance policies were assigned to the defendant company by the widow on May 27th, and Mrs. Bishop said in effect that she had sold and delivered the ring to Sholars after she had made the assignment of the insurance policies to the Undertaking Company, and since the testimony shows that Bishop was buried on May 30th and that the money had been collected on the insurance policies prior to the demand made by the plaintiff on June 9, 1947, and since the Company had made settlement on June 10th with Capitola Bishop out of the funds collected; that the defendant company is not bound by the statements made by its employee Sholars.

Appellant relies on the doctrine: "A declaration by an agent, not in the course of the negotiations, to which it refers and not shown to be within the scope of his authority, is not admissible against the principal. In order to render such admission competent it must have been made in connection with the discharge of the agent's duties." See Sinclair Ref. Co. v. Womack, Tex.Civ.App., 66 S.W.2d 402,

points 2 and 3, p. 404, and cases there cited. In support of this contention it also cites North River Ins. Co. v. Reeder, Tex. Civ.App., 288 S.W. 257; Western Produce Co. Inc. v. Citizens State Bank, Tex.Civ. App., 113 S.W.2d 951; West Texas Produce Co. v. Wilson, 120 Tex. 35, 34 S.W.2d 827 and Capitol Hotel Co. v. Rittenberry, Tex.Civ.App., 41 S.W.2d 697. Our view is that the foregoing rule is not applicable to the factual situation here. Evidence was tendered by plaintiff to the effect that its agent made inquiry of deceased's widow on the 9th of June about who had the ring and she referred him to the Undertaking Company and his testimony is positive to the effect that he had a conversation with some one at the Undertaking Company on the 9th of June about the ring and made demand for the ring, which was one day before defendant had its settlement with Capitola Bishop. Sholars, the general manager, admits that he was the party at the Undertaking Company who had the conversation with the California witness and he does not categorically deny such witness' testimony, but admits that such conversation was concerning the Bishop ring. Since defendant had not made settlement with Capitola Bishop at the time of the conversation on June 9th, we think that the testimony tendered as to such conversation between the California witness and Sholars was competent, in that under this record such conversation was in connection with the discharge of Sholars' duties as general manager of defendant company.

■ Under the record here made our view is that the court had the right to find impliedly that the Undertaking Company had received the ring and was holding it on the 9th day of June as security for Bishop's funeral expenses, notwithstanding the fact that it had previously taken the assignments of insurance policies and had made collection of the policies, but it had not, on the 9th of June, completely closed its transactions with Capitola Bishop, deceased's widow. Since we must assume from the evidence tendered that the trial court found that the Undertaking Company had received and held the ring as security for the funeral expenses of James Bishop,

it had no further right to hold the ring against a bona fide claimant after it had collected the proceeds of the insurance policies and had more than sufficient funds in its possession and control to cover its funeral bill without invoking the aid of the district court to direct it in this behalf. Since the evidence is without dispute that the defendant was paid out of the proceeds of the policies, the foregoing rule would apply after it made its settlement with Capitola Bishop on June 10th. Moreover, Sholars was in the employ of the Undertaking Company as general manager and as such was the agent of the defendant and defendant would necessarily be bound by all of his acts performed within the scope, or apparent scope, of his authority. The plaintiff could not be bound by any special or secret limitation of his authority. Since Sholars was in the employ of defendant company and since the company had notice that plaintiff was seeking to hold it for conversion of the ring, and since it also knew that its general manager had made all of the arrangements with the deceased's widow for the burial of James Bishop, we think it was appellant's duty by proper pleading to invoke the equity powers of the court and make a full disclosure as to its possession, and if the evidence tendered the issue that Sholars had breached his duty to defendant and had been guilty of fraud and deceit with his principal in his duties as its agent with reference to the possession of the ring, then in such event defendant could and should have asked for appropriate relief over against Sholars. This it wholly failed to do. In fact, we think the doctrine announced in West Texas Produce Co. v. Wilson, supra (Com.Apps., opinion adopted by S.Ct.) is applicable here. See point 34 S.W.2d p. 829. " 'The declarations made by an officer or agent of a corporation, in response to timely inquiries, properly addressed to him and relating to matters under his charge, in respect to which he is authorized in the usual course of business to give information, may be given in evidence against the corporation' * * * 'As in case of other agents, authority to make representations or admissions may be implied from an express authority to do

598

some act or to act in some capacity. Thus it is said by the Supreme Court of the United States that "the declarations made by an officer or agent of a corporation, in response to timely inquiries, properly addressed to him and relating to matters under his charge, in respect to which he is authorized in the usual course of business to give information, may be given in evidence against the corporation." ' "

Applying the above rule of law to the factual situation here, we think the declarations of the witnesses complained of in points 4 and 5 were admissible. Our view is that the evidence is sufficient to sustain the implied finding of the trial court that Sholars, as general manager of the Undertaking Company, did receive and hold the ring as security for the payment of the funeral bill of James Bishop; and since the Company had received and collected money on insurance policies by virtue of assignments more than sufficient to pay said funeral bill and accepted payment of its claim out of the proceeds of the policies, that it was guilty of conversion when it failed to deliver the ring to plaintiff when demand was made upon it so to do on June 9, 1947, and each of appellant's points is overruled.

Therefore, the judgment of the trial court is in all things affirmed.