Lynn McGEHEE and H. G. McGehee, Appellants,

v.

EXCHANGE BANK & TRUST COMPANY, Appellee.

No. 5749.

Court of Civil Appeals of Texas, Waco.

Jan. 26, 1978.

Rehearing Denied Feb. 23, 1978.

Sidney L. Farr, Houston, for appellants.

Kerry P. FitzGerald, Ken R. Davey, Dallas, for appellee.

## OPINION

JAMES, Justice.

This is a suit concerning conversion of a boat. Plaintiff-Appellee Exchange Bank and Trust Company sued Defendant-Appellants Lynn and H. G. McGehee (husband and wife) for damages for conversion of the boat in controversy against which Exchange Bank held a security interest. After jury trial the trial court entered judgment for Plaintiff Exchange Bank against Defendants McGehees for $15,222.39 plus interest and costs, from which the McGehees appeal. We affirm the trial court's judgment after reforming same as hereinafter shown.

On October 26, 1971, one Harry W. Baer, a resident of Tarrant County, Texas, executed a promissory note in the amount of $17,895.75 in favor of Plaintiff Exchange Bank, and also executed a security agreement and financing statement with respect to the boat in question which Baer at that time purchased. Then on November 1, 1971, Exchange Bank filed the financing statement in the office of the County Clerk of Tarrant County, Texas, the county of residence of Baer.

Thereafter Baer made periodic payments on the note and made two renewals of said note, the first time on January 26, 1972, for $22,785.00 and again on November 27, 1974, for $13,063.76. This last 1974 renewal note was never paid in full and on October 29, 1975, Exchange Bank took a default judgment against Baer in a Dallas County District Court for $12,509.44 plus $1212.95 interest and $1500.00 attorneys' fees and costs. Prior to this default judgment, however, in June of 1974, Baer sold the boat to the Defendant McGehees.

When the McGehees bought the boat from Baer in June of 1974, they had no knowledge of the Exchange Bank lien against it. Before buying the boat, Mr. McGehee specifically asked Baer whether he owed any money on the boat and Baer told him he did not.

Neither of the McGehees ever inquired with the Secretary of State or of the County Clerk of Tarrant County about a financing statement on the boat before they bought it, nor did anyone else ever check on same in their behalf.

The McGehees borrowed from Reisel Bank the funds necessary to buy the boat. Mr. McGehee testified that he asked Mr. Gary Welch, vice-president of Reisel Bank, to be sure there was no lien against the boat before Reisel Bank paid Baer the purchase price for the boat; however, Mr. Welch denied that McGehee ever asked him prior to McGehee's purchase of the boat, to check the lien records of the Secretary of State or the Tarrant County Clerk's office to determine whether there was a lien on the boat. Welch testified that he never made any such check. At any rate, the McGehees had no actual knowledge of Exchange Bank's lien on the boat when they bought it from Baer in 1974, and did not learn about it until 1975.

Trial was had to a jury in which the trial court submitted two special issues as follows:

(1) "Do you find from a preponderance of the evidence that the financing statement filed by Plaintiff, Exchange Bank and Trust Co., gave sufficient notice for a reasonable, prudent person to discover a lien existing on the said property herein?"

To this issue the jury answered: "It was sufficient."

(2) "Do you find from a preponderance of the evidence that in 1971, at the time the lien was filed, the boat in question was primarily used for personal and family use, or was in a contract for service?"

"Answer: 'It was used primarily for personal and family use' or 'It was used primarily for a contract of service.'"

The jury in response to Issue No. 2 answered: "It was used primarily for a contract of service."

The trial court's judgment recited: "The Court is of the opinion and finds that Special Issue No. 2 is not an ultimate issue of fact in this case and is not supported by the evidence and should be disregarded;" whereupon the judgment awarded Plaintiff Exchange Bank recovery against the Defendants McGehee in the amount of $15,-222.39 plus interest at 6% per annum from August 1, 1975 (the recited date of conversion) until the entry of judgment (December 16, 1976) in the amount of $1265.00 plus interest from date of judgment at 9% per annum and costs.

Defendants McGehee appeal upon sixteen points of error, the first five (5) of which complain of the trial court's disregard of the jury's answer to Special Issue No. 2.

Appellants contend that the jury's answer to Special Issue No. 2 to the effect that the boat was primarily used for a "contract of service" as opposed to "personal and family use" caused the boat to be classified as "inventory" under the Texas Business and Commerce Code and not as "consumer goods", in which event Exchange Bank was required to file the financing statement with the Secretary of State in Austin in order to perfect its lien or security interest. Appellants then go on to say that since Exchange Bank did not file their financing statement with the Secretary of State, that said Bank never perfected its security interest or lien as against Appellants who purchased the boat without actual knowledge of Exchange Bank's lien.

In other words, Appellants contend that Exchange Bank simply filed its financing statement in the wrong place, and thereby did not perfect its lien against the boat, and therefore Appellants bought the boat from Baer free and clear of any security interest in favor of Exchange Bank. Appellant contends, and correctly so, that a financing statement filed in the wrong place does not protect the secured party against a purchaser without knowledge of the security interest, citing *Meadows v. Bierschwale* (Tex.1974), 516 S.W.2d 125, 133.

Therefore the question we are obliged to answer is whether Exchange Bank by filing its financing statement in the Tarrant County Clerk's office filed same in the right place in order to perfect its security interest in the boat. In order to answer this question we first must determine whether the boat in question is classified as "consumer goods" or as "inventory."

Article 9.109 of the Texas Business and Commerce Code in its pertinent parts provides:

"Goods are

"(1) 'consumer goods' if they are used or bought for use primarily for personal, family or household purposes;

"(2) 'equipment' (not applicable to our case)—;

"(3) 'farm products' (not applicable to our case)—;

"(4) 'inventory' if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment."

Article 9.401, Texas Business and Commerce Code, deals with the place of filing financing statements, and in its pertinent parts provides:

"(a) The proper place to file in order to perfect a security interest is as follows:

"(1) when the collateral is—consumer goods, then in the office of the County Clerk in the county of the debtor's residence—;

"(2) when the collateral is timber to be cut (not applicable to this case)—;

"(3) in all other cases, in the office of the Secretary of State."

From the above statutes we see that if the boat was "consumer goods," the Exchange Bank had filed in the right place and thereby perfected their security interest; whereas if the boat was "inventory," then Exchange Bank had not perfected its lien.

Appellant contends that since the jury by its answer to Special Issue No. 2 found that the boat was primarily used in a "contract of service" at the time the lien was filed in 1971, that the boat is "inventory," which in turn meant that the financing statement should have been filed with the Secretary of State, that Exchange Bank thereby had no lien and that Defendant-Appellants were entitled to judgment in their favor. We do not agree.

■ We are of the opinion and hold that the evidence conclusively established as a matter of law that the boat in question fell into the classification of "consumer goods" because it was bought and used primarily for personal and family use. This being so, the trial court properly disregarded the jury's answer to Special Issue No. 2 and properly entered judgment in favor of Plaintiff-Appellee Exchange Bank.

■ As we understand it, the intent of the debtor-purchaser at the time of the sale when Exchange Bank's security instrument attached to the collateral is controlling, and no creditor is required to monitor the use of collateral in order to ascertain its proper classification. See *Commercial Credit Equipment Corporation v. Carter* (1973), 83 Wash.2d 136, 516 P.2d 767, 769, in which the Uniform Commercial Code of Washington provided definitions of "consumer goods" and "inventory" in language identical to our own Business and Commerce Code. Also see Article 9.401 of our Code in subsec-

tion (c) thereof wherein it provides: "A change in the use of the collateral does not impair the effectiveness of the original filing."

In the case at bar, Baer in 1971 financed the purchase of the boat in question from Exchange Bank and at the same time secured insurance and represented that the boat was for private purposes only and at said time noted that he would be using it in the Coast Guard Auxiliary. Both Mr. William Jones, the collections officer for Exchange Bank, as well as Mr. Charles Gagnon, the Allstate man who insured the boat, testified that the boat in question was a pleasure craft as opposed to being used for commercial purposes. Baer insured it as a pleasure craft. Insurance on boats used for commercial purposes is much higher than for pleasure craft, Gagnon testified.

When Baer insured the boat, he told the insurance man he would be using the boat in the Coast Guard Auxiliary which entitled him to a 10% discount in the policy premiums.

The Coast Guard Auxiliary is a volunteer non-profit organization which any citizen can join provided he has a boat or a radio or an airplane which he can use to perform the sole function of water safety patrol. Any member of the Coast Guard Auxiliary can simply run its flag up on his boat and he is acting under the auspices of the Coast Guard Auxiliary, according to Baer's testimony. When the boat is on patrol for the Coast Guard Auxiliary, the boat owner is reimbursed for his gas and oil used, and no more, and during such times of patrol, the Coast Guard assumes responsibility for the boat in case of accidents, thereby relieving the insurance carrier. In cases of emergency, the U.S. Coast Guard can call Auxiliary members and their boats out to patrol the waters. Baer testified that his use of his boat for Coast Guard Auxiliary purposes was not inconsistent with his use of his boat as a pleasure craft, and this was not contradicted. In summary, the boat was purchased for and used as "combination personal and Coast Guard use" and was not used for commercial purposes or for hire.

Baer used this boat about 80% of the time for the Coast Guard Auxiliary, and for a time commanded a flotilla for the Auxiliary on the Eagle Mountain Lake, in which all the flotilla members used a pleasure boat of some type.

Captain Boden, the marine expert who surveyed the boat before the McGehees purchased it from Baer, testified that the boat was designed for use as a pleasure craft, and not for commercial purposes.

■ Baer earned his livelihood as an insurance man, with a full time job as such. The use of the boat in question was for his and his family's hobbies of fishing, boating, and Coast Guard Auxiliary activity. All of these uses of the boat were to implement his and his family's hobbies, which meant that the boat was purchased for and used as a pleasure craft. In summary, the evidence conclusively shows and we hold as a matter of law that the boat was used for personal and family uses, thereby causing the boat to be "consumer goods" under the Code definition thereof. See the Uniform Commercial Code Comment, paragraph 3 under Article 9.109, Texas Business and Commerce Code, which sheds light upon the meaning of the terms "inventory" and "[goods] furnished under a contract of service." In our opinion, none of Baer's activities with the Coast Guard Auxiliary constitute a "contract of service" contemplated by Article 9.109(4) of the Texas Business and Commerce Code. Moreover, there is no evidence in the record of any contract, written or oral, between Baer and the Coast Guard Auxiliary. Appellants' points one through five are accordingly overruled.

Appellants' points ten through fifteen assert that the evidence is legally and factually insufficient to support the jury's answer to Special Issue No. 1. As stated before, by the jury's answer to Special Issue No. 1 it found that the financing statement filed by Exchange Bank gave sufficient notice for a reasonable, prudent person to discover a lien existing on the boat. We overrule these points of error.

■ Appellants contend that the errors and mistakes in the financing statement describing the boat are such as to render such financing statement void insofar as giving constructive notice of Exchange Bank's lien, "for a reasonable, prudent person to discover" such lien. The descriptive portions of the financing statement are hereunder shown in the lefthand column and the true facts are shown in the righthand column:

| FINANCING STATEMENT | TRUE FACTS |
|---|---|
| 65–Owens Flagship 40′ | 1962 Owens Flagship 40′ |
| Double Cabin # 151–7723 | Hull # 151–7723 |
| 2 Chev. Engines # 7723RHRHM8 and # 7723LHLHM8 | Engines # 7723LHRHM8 and # 7723LHLHM8 |
| Power Plant Onan Model # 32C680788 | Serial Number # 32C680788 |
| TX–7550–AY | TX–7250–AY |

As to the model of the vessel, it is true that the financing statement showed the boat to be a 1965 model whereas in fact it was a 1962 model. Captain Boden, the Appellants' marine expert who surveyed the vessel, testified that the actual hull designs on such vessels changed very little particularly during these years and therefore it was extremely difficult to tell the difference between a 1962 and a 1965 model. Moreover, the model year never appeared on the vessel itself, but actually had to be carefully researched by Captain Boden who himself could not detect the model year without reviewing the catalogues peculiar to his trade. Of course, as seen, the description of the boat as a forty-foot Owens Flagship was correct.

Next, the double cabin number 151–7723 in the financing statement is the same as the hull number testified about, and is correct. Then, with reference to the two engine numbers, one of these was correct in every detail, where there was an error in the other. However, Boden testified that the first four digits (7723) constituted the identification of the engines, and therefore the discrepancy in the second engine number was of no consequence as it did not affect the identification of the engines themselves. In other words, he testified that the first four digits, 7723, indicate that the two engines are peculiar to this vessel, and the remainder of the digits one of which is incorrect only show where the en-

gine is supposed to be mounted and the manner of rotation and have nothing to do with the identification of the engines.

Next, the true serial number of 32C680788 appears on the financing statement preceded by the words "Power Plant Onan Model."

Finally, the license registration number has an error in it, the true number being TX–7250–AY whereas the financing statement showed it to be TX–7550–AY.

Thus, of nine separate pieces of information concerning the vessel, only one of substance was incorrect and the great majority were accurate. That is to say, the inaccuracies are minor in nature and not such as to mislead any person examining the recorded financing statement. As stated before, neither Mr. nor Mrs. McGehee nor anyone in their behalf ever checked the records in the Tarrant County Clerk's office or the Secretary of State's office. Mr. McGehee testified that if he had seen the financing statement on file in Tarrant County that he would not have bought the boat.

Article 9.110, Texas Business and Commerce Code, dealing with sufficiency of description, provides:

"Except as provided in Subsections (c) and (f) of Section 9.402, any description of personal property or real estate is sufficient for the purposes of this chapter whether or not it is specific if it reasonably identifies what is described."

Applying this statutory test to the descriptions contained in the financing statement in question, we are of the opinion and hold that the evidence is legally and factually sufficient to support the jury's answer to Special Issue No. 1, and that such financing statement as filed constituted constructive notice of Exchange Bank's lien to the McGehees.

■ The rule has been stated that, as between the mortgagee and third parties, it is not essential that the description be so specific that the property may be identified by it alone, if such description suggests inquiries or means of identification, which, if pursued, will disclose the property cover-

ed by the mortgage. *Finger Furniture Co. v. Chase Manhattan Bank* (San Antonio CA 1967), 413 S.W.2d 131, NRE, and the cases cited therein on page 135; also see *Francis v. Reed* (Amarillo CA 1968), 428 S.W.2d 356, 358, no writ; *In Re Nero* (5th Cir. 1974), 501 F.2d 1354; *Vintage Press, Inc. v. Mullins* (5th Cir. 1977), 552 F.2d 1145.

■ Appellants' sixteenth and final point asserts the trial court erred in rendering judgment in the amount of $15,222.39 plus interest. We sustain this contention. Mr. William Jones, the collection manager for Exchange Bank, testified that on April 16, 1975, when the last payment was made on Baer's note, the balance was $10,724.21, which was a "net figure and not a gross figure." There was no explanation of what was meant by the terms "net figure" and "gross figure." The last renewal note executed by Baer of which the $10,724.21 was the final balance, provided: "All past due amounts shall bear interest at 10% per annum." Since this note was payable in monthly installments, it appears to us that interest at the rate of 10% per annum should be charged on the $10,724.21 figure from May 16, 1975, until the date of the trial court's judgment, to wit, December 16, 1976, such interest amounting to $1698.01.

We accordingly reform the judgment so as to award Plaintiff-Appellee Exchange Bank judgment against Defendant-Appellants in the amount of $10,724.21 plus $1698.01 interest same being interest at 10% per annum from May 16, 1975 until December 16, 1976, the date of trial court's judgment, said judgment being in the total amount of $12,422.22, together with interest from and after judgment until paid at the rate of 10% per annum. Article 5069–1.05, Vernon's Annotated Civil Statutes. When mortgaged property has been wrongfully converted, the mortgagee may proceed at any time to recover for the value of the property up to the amount of the debt. *Terry v. Spearman* (Comm.App.1924), 259 S.W. 563, 565, approved; *Crawford Undertaking Co. v. Siegel* (Waco CA 1950), 230 S.W.2d 590, 595, 596, no writ. Here, since it is undisputed that the value of the boat at

the time of conversion exceeded the debt, Plaintiff-Appellee is entitled to judgment in the amounts as above set out, and the trial court's judgment is hereby so reformed, and as reformed, is affirmed.

Costs in the trial court as well as those on appeal are adjudged one-half to Appellants and one-half to Appellee.

Appellants have other points and contentions, all of which we have carefully considered and we overrule same as being without merit.

REFORMED AND AFFIRMED.