**MOSSLER ACCEPTANCE CO. v. JOHNSON.**

Civ. No. 400.

United States District Court
W. D. Arkansas, Texarkana Division.

Oct. 11, 1952.

Richard H. Cocke, Dallas, Tex., and Connor W. Patman, Texarkana, Tex., for plaintiff.

W. S. Atkins, Hope, Ark., for defendant.

LEMLEY, Chief Judge.

This cause comes on for final disposition upon the pleadings, the oral testimony taken at the trial before the jury, (which testimony has been transcribed), the documentary evidence introduced by the parties, the jury's answer to the single interrogatory propounded to it, and written briefs.

This is an action brought by Mossler Acceptance Company, a Delaware corporation, against Beverly Johnson, a citizen of Arkansas, who resides and does business at Hope, Hempstead County, Arkansas, under the trade-name of "Standard Auto Company", for damages for the alleged conversion of three Cadillac automobiles, a Chevrolet automobile, and a Ford pickup truck.[1] These vehicles were sold by defendant to one H. T. (Ford) Hermansen, in February of 1951, and possession thereof and indicia of title thereto were delivered to Hermansen, who thereafter mortgaged them to the plaintiff. The checks given by Hermansen to the defendant for the purchase price of four of the vehicles, and the draft drawn by the defendant for the purchase price of the fifth vehicle, were not paid when presented, and the defendant, without the knowledge or consent of the plaintiff, repossessed the vehicles and removed them from Texas to Arkansas where he later disposed of them.

The material facts in the case, many of which are not disputed, are substantially as follows:

The plaintiff, Mossler Acceptance Com-

[1]. In its complaint the plaintiff sought possession of the vehicles or their value; it developed, however, that defendant no longer has any of the vehicles in his possession so the action remains simply as a suit for damages for conversion.

pany, is engaged in the business of financing automobile dealers in the purchase of automobiles for resale; it does business in Texas, Florida, and Louisiana. H. T. Hermansen, who purchased the vehicles involved in this case from the defendant, was, between 1946 and March of 1951, a large dealer in used cars within the State of Texas, maintaining lots at Rosenberg, Houston, Wharton, and Victoria; with a minor exception, not here pertinent, all of his financing was done by the plaintiff, and he was plaintiff's largest single customer. It was Hermansen's custom to "floor plan" with the plaintiff all automobiles which he purchased for resale; that is to say, when Hermansen would buy a car, he would borrow money on it from the plaintiff, giving a note and mortgage as security therefor; thereafter, when the vehicle was sold, Hermansen would give a check to the plaintiff in the amount of his indebtedness on said vehicle, and the plaintiff would, upon receipt of such check, release its mortgage so that the purchaser could obtain a good title. At the time of the transactions involved in this case, Hermansen owed the plaintiff around $300,000. Prior to March 8, 1951 plaintiff would occasionally have returned to it checks drawn by Hermansen in its favor on the ground that his balance in the bank upon which said checks were drawn was insufficient to cover them;[2] such a return of Hermansen's checks was a comparatively rare occurrence, however, and was not considered as being particularly significant or alarming in view of the nature and large volume of his business. Prior to March 8, 1951 Hermansen had always made his returned checks good upon being notified of their return.

The defendant is a used car dealer in Hope, Arkansas, and had had dealings with Hermansen for about three years prior to March of 1951, during which period he had sold Hermansen three hundred or more automobiles, which Hermansen transported into Texas for resale. There can be no question that when defendant sold the vehicles involved in this case, he and his employees knew that the vehicles would be taken into Texas and sold there.

When the defendant first began to do business with Hermansen, he protected himself by drawing drafts on Hermansen and sending them, with title papers attached, through his bank for collection; thus, Hermansen could not obtain the title papers on the vehicles purchased until he had paid the drafts. As the dealings between Hermansen and the defendant progressed, however, defendant's confidence in Hermansen was established to the extent that he became willing to accept the latter's checks in payment for vehicles purchased and to deliver to Hermansen not only possession of such vehicles but also title papers indicating that the vehicles had been fully paid for and that Hermansen (who traded under the name "City Motor Sales") was the absolute owner thereof. This method of doing business was known to Miss Nell McCargo, who was defendant's bookkeeper, and who was also authorized to sell automobiles for him if he was away from his place of business.

On February 15, 1951 Hermansen purchased from Johnson the Ford truck involved in this case for a price of $1,500; this truck had been obtained by Johnson on February 13, 1951 from Branch Brothers Motor Co., Inc., of Springhill, Louisiana; title was taken in the name of one Eddie Powell, an employee of the defendant, but it was actually the defendant's car. The invoice from Branch Brothers reflects full payment of the purchase price and contains the recitation that: "This car is new and unregistered in any state." After defendant sold this truck to Hermansen, Powell executed a bill of sale in favor of "City Motor Sales", which recited a consideration of $10, "to me in hand paid at or before the execution of these presents." This bill of sale showed that the truck

---

2. Hermansen maintained two bank accounts; one of his banks would return bad checks promptly, but the other made a practice of holding such checks and did not return any until March 8, 1951 at which time it returned a large number, as will be hereafter noted.

was new and unregistered. Hermansen paid for this truck by means of a check dated February 15; the check was not deposited, however, until February 27, at which time the title papers, consisting of the invoice of Branch Brothers to Powell and the bill of sale from Powell to City Motor Sales, were mailed to one Al Richtor, an employee of Hermansen.

On February 17, 1951 Hermansen bought from the defendant the Chevrolet automobile with which we are concerned for a price of $2,125; this car had been purchased by defendant from the Lassiter Auto Sales of Murray, Kentucky, for $2,100; the invoice reflects full payment of the purchase price and contains the recitation that the vehicle was new and unregistered. Defendant executed a bill of sale covering this vehicle which showed full payment of the purchase price and recited that the car was new and unregistered. No check was given in payment for this vehicle by Hermansen, but on February 27, 1951 defendant drew a draft on Hermansen for the purchase price, and deposited it for collection on the same day; a notation on the draft shows that the title papers were mailed separately.

It is to be noted that while the Ford truck was sold and the check in payment therefor given on February 15, and while the Chevrolet was sold on February 17, the draft for the purchase price of the Chevrolet was not drawn until February 27, and the check covering the purchase price of the Ford was not deposited in the bank until that day; on February 27 both items were deposited in the People's Bank of Waldo, Arkansas, and were presented to the drawee bank, which refused payment, the date of such refusal not being shown by the evidence. Said items were again "sent through" on March 7, and payment was again refused. The defendant testified that the reason for the delay in depositing the check and drawing the draft was that at the times these respective vehicles were sold and delivered to Hermansen, he had not yet received the title papers, and that as soon as he received them, he

deposited the check and drew and deposited the draft. As indicated, however, defendant did not attach the title papers to the draft or check but mailed them separately to Hermansen's employee, Richtor. Defendant further testified that when the check and draft were not honored, he called Hermansen by long distance telephone, and that the latter advised him that he had been having some difficulty with his finance company, but that the matter had been straightened out, and that the check and draft should be presented again; this was done, but payment was again refused. Endorsements on the check and draft indicate that the date upon which they were mailed to the drawee bank the second time was March 7, 1951.

All three of the Cadillac automobiles were purchased by Hermansen on February 28, 1951, the transaction being handled by Hermansen on the one hand and by Miss McCargo on the other, since Johnson was ill at the time and away from his place of business. On the date just mentioned Miss McCargo had occasion to make a long distance phone call to Hermansen in connection with some other cars which he had purchased, and she reached him while he was in the plaintiff's office at Houston. In the course of the conversation Hermansen asked her whether or not she had any other cars for sale; she advised him that Johnson had none but that another dealer had called and that he had some Cadillacs which he wanted sold for him. Miss McCargo suggested to Hermansen that he buy directly from this other dealer, but he stated that he did not know this man, and that if she would "go ahead and get them for him, to go ahead and he would mail me his check, and we went ahead and closed the deal." She stated that the deal on these vehicles was closed on that basis over the telephone, and that Hermansen mailed a check for each of the three vehicles, each check being in the sum of $3875. While there is no direct evidence in the record with respect to when or where these cars were delivered to Hermansen, it seems clear from the record as a whole that they, together with title papers, were delivered to

him prior to the time that he drew checks in payment for them.[3]

We have already pointed out that the title papers on the Ford and Chevrolet recited that those vehicles were new and unregistered; a different situation existed with respect to the Cadillacs, however; each of these vehicles had been registered in other states and certificates of title had been issued thereon. One of these vehicles was covered by an Illinois title, one by a Michigan title, and the other by a Missouri title. The Illinois and Missouri title certificates were so endorsed as to show transfers from the registered owners directly to Hermansen; the Michigan title, originally issued to one Wetsman, showed an assignment from him to the Cadillac Motor Car Division in Detroit; there is an assignment from the latter to Freese Motor Sales, and a final assignment purportedly from Freese Motor Sales to Hermansen. None of these title certificates or the assignments thereof showed any outstanding liens and on none of them did the name of the defendant or any other Arkansas dealer or citizen appear.

These three cars were sold to Hermansen on February 28, but his checks in payment therefor are all dated March 2. Said checks were mailed to defendant and by him deposited in the bank at Waldo. Payment on all of them was refused. As a matter of fact, the defendant testified that he never paid for these vehicles himself, and that after he repossessed them, he simply turned them back to the dealer from whom he had obtained them.

At the conclusion of the telephone conversation between Hermansen and Miss McCargo, which took place while Hermansen was in the plaintiff's office, Hermansen made certain remarks to Mr. Andry, plaintiff's credit manager at Houston, to which the defendant attaches considerable importance since he contends that it placed the plaintiff on at least constructive notice that the Cadillacs had not been paid for,

and that he was unable to pay for them without the assistance of plaintiff. Hermansen is very vague and indefinite as to exactly what he said to Andry, and actually gives three different versions of the remark which he made. The first version, which was elicited from him on direct examination by the defendant, was that he told Andry that "there was (sic) some checks on four Cadillacs I had bought and it (sic) had not cleared;" he further stated in giving this version that: "I made some remark, 'I hope you boys won't cut me off, I mean, I got to cover those checks;' it was something in that manner. Of course, I don't know, it has been a year or two ago. It is hard to say the exact conversation, or even the exact—the way it was put up, or brought up." This version is obviously incorrect because none of the checks covering the Cadillacs had been written on February 28, and none was written until March 2. Hermansen's second version is that he told Mr. Andry that he was buying four Cadillacs and something about, "You guys better not cut me off, I've got to clear the checks." In this version he refers to the conversation as being "round-about", and he repeats that he is not sure exactly what he did say. The third version, brought out on redirect, is that "more or less jokingly" he asked Mr. Andry: "Reckon I ought to buy four Cadillacs?" He states that Andry replied, "Let's go, or something like that." The significance and effect, if any, of this conversation will be hereinafter discussed.

On March 2, 1951 Mrs. H. T. Hermansen, who held a general power of attorney from her husband, and conducted a good deal of his business, borrowed $3,000 on the Cadillac with the Illinois title, and a like sum on the Cadillac with the Missouri title; on the following day she made a $3,000 loan on the other Cadillac. In connection with these loans she executed separate notes and chattel mortgages covering each of the three vehicles [4], and plaintiff delivered to her three separate checks, each

---

3. The record does not show whether defendant delivered these cars to Hermansen in Texas or whether Hermansen or his employees came to Hope and got them. In his pretrial deposition, por-

tions of which were read in evidence at the trial, defendant stated that deliveries were handled both ways.

4. Each of these notes was in the sum of $3,005; the extra $5 represented a cus-

in the sum of $3,000, which checks were deposited in one of Hermansen's bank accounts.

On March 8, 1951 Mrs. Hermansen appeared at the offices of the plaintiff for the purpose of floor planning a number of vehicles including the Ford truck and the Chevrolet automobile; loans were negotiated on both of these vehicles, that on the Ford being in the sum of $1,105, and that on the Chevrolet amounting to $1,855, including the customary carrying charge; notes and mortgages were drawn up and signed by Mrs. Hermansen; and checks in the sums of $1,100 and $1,850 were drawn by plaintiff in favor of H. T. Hermansen, d/b/a City Motor Sales. These checks were not delivered at this time, however, for the reason now to be stated.

Prior to March 8, 1951 Hermansen had sold a large number of automobiles and in order to secure releases of the mortgages held by the plaintiff had drawn checks in its favor for the amount of its liens; these checks had been accepted by plaintiff, and its liens had been released. Unknown to the plaintiff many of these checks were not good and by March 8 approximately $70,000 of these checks had accumulated in the hands of one of the banks with which Hermansen did business and upon which these checks were drawn. We have already referred to the fact that Hermansen maintained two bank accounts, and that one of his banks had never returned a check drawn by him until March 8. On that date this bank decided that it could no longer hold Hermansen's checks and returned them to plaintiff's bank, which notified plaintiff of their return while Mrs. Hermansen was still in the office and before she had received the checks on the Ford and Chevrolet. Upon receiving this information from the bank, plaintiff's employees contacted Mr. Hermansen, who was in Tyler, Texas, at the time, and, to quote plaintiff's credit manager, Mr. Andry, "It was agreed to hold up everything that she had brought in that day until he came in,

so he (sic) didn't endorse it (the check for the loan on the Chevrolet) that day. That check was issued but not endorsed, and not cashed."

March 8 fell on Thursday, and Hermansen returned to Houston the following day, and negotiations between him and the plaintiff took place on that day and on Saturday, March 10, looking toward the clearing up of his bad checks and the straightening out of his affairs. It was finally agreed that Hermansen would endorse over to the plaintiff the checks drawn by the latter on March 8, including the checks representing the loans on the Ford and Chevrolet, and that Hermansen would execute in favor of the plaintiff a second mortgage covering his equity in a large number of vehicles including the three Cadillacs and the Ford truck here involved. This deal was consummated on Monday, March 12, at which time Hermansen endorsed the checks on the Ford and Chevrolet and also a number of other checks drawn in his favor on the 8th, but not delivered to him. On said date he likewise executed a note for $29,426.50, the value of his equity in the cars covered by the second mortgage, and the mortgage itself. A check in his favor was drawn in the sum of $29,426.50, and he endorsed that as well; we find that all of these checks were delivered to him for the purpose of endorsement, and that he endorsed them pursuant to the agreement which had already been reached between him and the plaintiff. While Hermansen testifies that none of these checks was signed at the time of his endorsement, Mr. Seamon testifies that they were all signed at that time, and we accept his testimony; we further find that the checks on the Ford and Chevrolet, dated March 8, were signed on that date by Mr. Andry, although they were not delivered until the 12th. The checks on the Ford and Chevrolet and the $29,426.50 check were deposited by the plaintiff after they had been endorsed by Hermansen. The check on the Chevrolet and the $29,426.50 check were endorsed by

tomary carrying charge on each vehicle floor planned with the plaintiff. These notes, and the other notes which we shall

presently mention, were all payable on demand.

plaintiff as follows: "For Deposit, Mossler Acceptance Company"; the check on the Ford was endorsed by the plaintiff, "For Deposit Only, Mossler Acceptance Company, Trustee, Mercantile Commerce Bank & Trust Co., With Recourse on Us, Mossler Acceptance Company." When asked about this particular endorsement, Mr. Andry testified: "The check is marked 'For Deposit Only, Mossler Acceptance Company, Trustee.' That depends on which account we deposit it in." He further stated that "Mossler Acceptance Company, Trustee" was just a separate account, and in response to a question by the Court with respect to what the trust account was, he replied: "That is just the normal bookkeeping that is concerned with the bank in St. Louis." It is to be noted that the second mortgage and the note which it secured bear date of March 10, 1951, but plaintiff's witness, Seamon, testified definitely that said instruments were not executed until the 12th.

The evidence as to how the proceeds [5] of the first mortgage loans on the Ford and Chevrolet and of the second mortgage loan were applied is indefinite; the plaintiff did not call its bookkeeper to make this proof, nor did it introduce any books or records showing such application; it relied simply upon the testimony of Mr. Andry, its credit manager, and it appears to us that Mr. Andry did not possess the information necessary to enable him to testify accurately and in detail on this point. We gather from the plaintiff's brief that it is its theory that the proceeds of the first mortgage loans on the Ford and Chevrolet and on the other vehicles which Mrs. Hermansen undertook to floor plan on March 8 were used in part to release existing liens which it held on automobiles which Hermansen had sold, and in part to take care of some of the bad checks which had been given to it by Hermansen; and that the note and second mortgage for $29,426.50 were applied entirely to bad checks given by Hermansen. Plaintiff bases this theory upon the testimony of Mr. Andry, and we accept its in-terpretation of said testimony on this point. It does not appear, however, that any of the checks issued on the 8th, and endorsed by Hermansen on the 12th, were applied to any particular accounts, or that any lien was released on the strength of any one particular note and mortgage. In this connection Mr. Andry testified: "* * * it was in one lump sum. In other words, there was a group of checks; it was not specified that this check will go to this account and this one to that, but it was agreed that some of these titles we would release them, and whatever was over would apply on his returned checks."

In his brief, counsel for the plaintiff states that the sum of $29,426.50, evidenced by the second chattel mortgage and the note secured thereby, "represented a combination of a number of hot checks which were renewed and extended by the execution of such note and mortgage." There was no direct testimony that Hermansen's obligations to the plaintiff, represented by the bad checks, were "renewed or extended", and it is to be pointed out in this connection that the second mortgage note, like all of the other notes involved in this case, was payable on demand. Unfortunately, no witness testified as to the details of the agreement between plaintiff and Hermansen after March 8; all that is before us is some general testimony to the effect that the plaintiff was trying to help Hermansen out, to put him back in business, and to help him get out from under his bad checks.

In the meantime, the defendant had become concerned about not getting his money on any of these vehicles, and he went to Texas to look into the matter; while on this visit, he had a conversation with Mr. Seamon, plaintiff's branch manager, in the course of which he advised Seamon that he had not been paid for these vehicles. Since this conversation put the plaintiff on actual notice of the situation with respect to these vehicles, the date thereof becomes important. Defendant testified that the conversation occurred about

5. The word "proceeds", as here used, does not refer to "new money" since none was advanced.

a week after March 9, which would have been after all of the transactions which have been outlined had been consummated. Mr. Seamon, however, testified definitely that the conversation took place on Saturday, March 10, which, of course, was prior to the date upon which Hermansen endorsed the checks on the Ford and Chevrolet and before he executed the second mortgage and the note secured thereby. We feel that Mr. Seamon's testimony is more to be relied upon than that of the defendant with respect to the date of the conversation, since defendant was not too definite as to the date thereof, and for the further reason that Mr. Seamon impresses us as being the more methodical of the two men and the one more likely to recall specific dates with accuracy. Our acceptance of Seamon's testimony on this point is not to be taken as an impeachment of the defendant's veracity; as a matter of fact, in testifying that the conversation took place about the week after March 9th the defendant was testifying against his own interest, whereas in testifying that said conversation took place on the 10th Mr. Seamon was testifying against the interest of his employer.

Both defendant and Seamon testified that the vehicles had been repossessed prior to the conversation above referred to, and since we accept Seamon's testimony as to the date of the conversation, it follows that the repossession took place between the 8th and the 10th. On the date of the repossession employees of Hermansen drove the vehicles to Tyler, Texas, where they were surrendered to employees of the defendant who drove them back to Hope. After the vehicles reached Hope, defendant returned the Cadillacs to the individual from whom he had obtained them, and he thereafter sold the Ford and Chevrolet to unidentified persons.

Under date of March 10, Mrs. Hermansen applied for Texas certificates of title on the three Cadillacs, and in her application she stated under oath that said vehicles were owned by City Motor Sales and were subject to no liens, except a first and second mortgage to plaintiff. Under date of March 12 she made similar applications for Texas certificates of title on the Ford and Chevrolet; the application for title on the Ford showed the first and second mortgage in favor of plaintiff, and the application for title on the Chevrolet showed a first mortgage in favor of plaintiff. (The Chevrolet was not included in the second mortgage.) In due course Texas certificates of title were issued on all of these vehicles showing ownership in City Motor Sales subject to the liens of the plaintiff.

Upon the trial of the case the plaintiff moved for a directed verdict at the close of all of the evidence, upon which motion we reserved our ruling and submitted the case to the jury upon a single interrogatory, consisting of two parts, together with instructions in connection therewith, reserving for later determination the issues of law in the case and such issues of fact, if any, as were not submitted to the jury. No objection was made by either party to the form of Interrogatory propounded to the jury, and neither side requested any additional interrogatories; nor was any objection made to the instructions.

The first part of the Interrogatory propounded to the jury inquired whether or not the latter found from a preponderance of the evidence, with respect to each of the three Cadillac automobiles, that at the time the plaintiff made its original loans on said vehicles it had "actual notice" that said vehicles had not been paid for. This part of the Interrogatory was answered "No", as to each of the Cadillacs. The second part of the Interrogatory, which was not to be answered as to any vehicle unless the answer to the first part of the Interrogatory was "No" with respect to such vehicle, inquired whether or not the jury found from a preponderance of the evidence that at the time the original loans were made on the Cadillacs the plaintiff had "constructive notice" [6] that they had not been paid

6. "Constructive notice" was defined to the jury as being "knowledge of facts or circumstances which would put a reasonably prudent man on such inquiry as, being made with reasonable diligence and understanding, would have led to actual knowledge of the fact that such vehicle or vehicles had not been paid for."

for; this part of the Interrogatory was answered "Yes" as to each of the Cadillacs. Thus the jury found that at the times the original loans on the Cadillacs were made, the plaintiff had no actual notice of the defendant's claims, but that it did have constructive notice thereof, as the term "constructive notice" had been defined in the instructions.[7]

After the jury returned its answer to the Interrogatory, an order was entered continuing the case for final disposition, and counsel were directed to submit briefs in support of their respective contentions, which has now been done.

In its brief the plaintiff takes the position that its first mortgages on all five of the vehicles and its second mortgage on Hermansen's equity in four of said vehicles are superior to the claims of the defendant, and that the latter by reason of his repossession of the vehicles became guilty of conversion and is liable therefor. In support of this position it contends that it paid a valuable consideration for all of its mortgages, and that it had no notice, either actual or constructive, of the fact that defendant had not been paid for said vehicles. In other words, it contends that it is entitled to protection as a bona fide purchaser for value and without notice of the defect in Hermansen's title. With respect to notice it argues that there was no substantial evidence to sustain the finding of the jury that it had constructive notice of the fact that the three Cadillacs had not been paid for at the time it loaned money upon them; and it further contends that it is protected as to all of the vehicles by reason of certain provisions of the Certificate of Title Act of the State of Texas, Vernon's Annotated Penal Code of Texas,

Article 1436-1; in this connection it contends that defendant could have protected himself by requiring that an "importer's certificate" be issued showing his lien and attaching thereto the title papers which he delivered to Hermansen, or by having the automobiles licensed by himself or Hermansen and procuring certificates of title showing his liens, and that since he followed neither of these courses, but delivered the vehicles together with complete indicia of ownership to Hermansen, he had no lien superior to the mortgage liens of the plaintiff.

Defendant argues, on the other hand, that there was substantial evidence to sustain the jury's finding as to constructive notice, and he contends further that the first mortgages on the Ford and the Chevrolet and the second mortgage on all of the vehicles but the Chevrolet were not supported by such a consideration as would make plaintiff a bona fide purchaser as far as said mortgages are concerned.

Since plaintiff's mortgages were taken while the vehicles were physically present in the State of Texas, and since the repossession thereof by the defendant took place there, the rights of the respective parties must be determined by Texas law. Pruitt Truck & Implement Co. v. Ferguson, 216 Ark. 848, 227 S.W.2d 944; Dobbins v. Martin Buick Co., 216 Ark. 861, 227 S.W.2d 620.[8]

Taking up first the claims of the plaintiff based upon the first mortgages on the Ford and Chevrolet and upon the second mortgages on Hermansen's equity in all of the vehicles, except the Chevrolet, we do not believe that these claims can be sustained in view of the fact that on March 12th, when the transactions relating to said

---

7. Defendant makes no contention that the plaintiff was charged with constructive notice of his claims by reason of any filing, recording or registration thereof among the public records of Hempstead County, Arkansas, Fort Bend County, Texas, or elsewhere, since there was no such filing, recording or registration of his claims. The only type of "constructive notice" involved in this case is that which might be imputed to the plaintiff by law growing out of the knowledge on

its part of facts sufficient to put it upon inquiry which, if pursued with reasonable diligence and understanding, would have led to actual knowledge of plaintiff's claims.

8. In a diversity case a federal district court applies the conflict of laws law of the state in which it sits. Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.

mortgages were consummated by Hermansen's endorsement of the several checks which have been mentioned and by his execution of the second mortgage and note secured thereby, the plaintiff, according to the testimony of its own branch manager, had actual knowledge of the defendant's claim, and for the further reason that, in our opinion, plaintiff has failed to show by a preponderance of the evidence that it paid a valuable consideration for said mortgages.

The law of Texas appears to be well settled that where one obtains an interest in chattels from the holder of a defeasible legal title, he is not protected in said interest unless he occupies the position of a bona fide purchaser for value and without notice. In order for one to occupy such position it must appear that he acquired his interest in good faith and without notice of outstanding claims and that he paid a valuable consideration therefor. If, at the time of his purchase or acquisition, he had notice of an outstanding claim, or even if he had no notice, but paid no value for his interest, then he is not entitled to protection as a bona fide purchaser.

In 37 Tex.Jur. "Sales," Section 214, the general rule in Texas is stated as follows: " * * * it is a settled rule that a buyer can ordinarily acquire no better title than his seller had; and a person who buys goods from one who neither owns them nor is authorized by the owner to sell them, or from one whose title is incomplete or encumbered, gets either no title at all or else a title that is subject to the claims of persons who have an interest in the goods or a lien thereon, unless he can show that by reason of being a bona fide purchaser it would be inequitable to make him suffer the attending loss." In the next section of the cited work it is said that a buyer can be regarded as a bona fide purchaser only when he acts in good faith, pays a valuable consideration for a legal title, and has no notice of the rights of others in the subject matter of the sale. 37 Tex.Jur. "Sales," Section 215. In the case of R. Piel Gin Co. v. Independent Farmers' Gin Co., Tex. Civ.App., 257 S.W. 630, 632, it was said that a bona fide purchaser is protected because: " * * * he has expended his money * * * relying upon an apparent situation reasonably calculated to mislead him, which the real owner has created or at least has permitted to continue to exist. On that account it is inequitable to require such purchaser, rather than the real owner, to suffer the attending loss." In that case a bona fide purchaser was defined as being: "a purchaser for a valuable consideration, without notice of (an outstanding) claim, and without notice of facts sufficient to put (him) on inquiry with reference thereto."

Stated conversely, the rule is that: "a buyer who, in good faith and for a valuable consideration, has purchased goods from the holder of the legal title, without actual or constructive notice of any rights of third persons, acquires the absolute property in them, taking them free from all pre-existing demands, whether of an equitable owner, a creditor of the seller, or the holder of a lien thereon, * * *. But the rule is, of course, wholly different if the buyer was not a bona fide purchaser. In such case his right in the goods is subject to any interests that other persons may have therein. Thus, one who buys a commodity from another, knowing that it is charged with a lien in favor of a third person, takes it subject to the lien." 37 Tex.Jur., Sec. 218, "Sales". This rule is, of course, applicable to a chattel mortgagee who takes a security interest in a chattel as well as to one who acquires the property outright. See 9 Tex.Jur. "Chattel Mortgages", Secs. 20 and 62.

The crucial date to be considered in determining whether or not one is a bona fide purchaser, from the standpoint of notice, is that upon which he actually parts with consideration for the property or his interest therein. It is not sufficient that at the inception of the transaction he had no notice of an outstanding claim; if he obtains such notice prior to the time that he pays value, he is not protected. In this connection it is said in 37 Tex.Jur., "Sales", Section 215: "But the moment a

buyer learns the real facts he must heed them. If he is heedless thereafter he loses the protection accorded him by the doctrine. Thus, when a buyer who has paid a part of the purchase price of goods without knowledge that any person other than the seller claimed an interest therein, proceeds to pay the balance after he receives due notice of another's claim, he will be protected only to the extent of the first payment." In Tillman v. Heller, 78 Tex. 597, 14 S.W. 700, 11 L.R.A. 628, the Supreme Court of Texas said: "We * * * conclude that the appellee can only be protected to the extent of the money actually paid at the time he received notice of the fraudulent intent of the vendors in making the sale, unless the notes given by him were negotiable by the law-merchant." In Texas Produce Co. v. Turner, 7 Tex.Civ.App. 208, 26 S.W. 917, the defendant bought a stock of merchandise from the holder of the apparent title, but before making payment he discovered that his vendor had no right to sell; it was held that the defendant was not a bona fide purchaser for value. The same result was reached in Abilene Mill & Elevator Co. v. Finley, Tex. Civ.App., 34 S.W. 311, where one who had obtained merchandise from the owner by means of a fraudulent financial statement transferred the same to a buyer in consideration of the latter's assumption of certain debts; prior to the payment of any of these debts the buyer learned of the seller's fraud, and it was held that he was not entitled to the protection afforded to a bona fide purchaser for value and without notice. Likewise in Parma v. First National Bank of Cameron, Tex.Civ.App., 63 S.W.2d 692, the Vest Cotton Company purchased 44 bales of cotton from Parma without paying therefor, and thereafter transferred the

cotton to the Bank; at the time that the Bank paid for the first 40 bales of the cotton, it had no notice of the fact that Parma had not been paid, but it obtained such notice prior to paying for the last 4 bales, and it was held that it was not a bona fide purchaser as to those bales.

Assuming for present purposes that the plaintiff paid a valuable consideration for its first mortgages on the Ford and Chevrolet and for its second mortgage upon Hermansen's equity in all of the vehicles, except the Chevrolet, the fact remains that at the time such payment was made, March 12, 1951, it had actual notice of the fact that defendant had not been paid for said vehicles. This being true it follows that plaintiff is not entitled to protection as a bona fide purchaser with respect to said mortgages unless, as it apparently contends, the general principles of Texas law which have been mentioned have been so altered by the Texas Certificate of Title Act as to afford it protection in spite of its actual knowledge of defendant's claims.

Plaintiff's position in this connection is based upon the premise that the sales of the vehicles in question by defendant to Hermansen were "first sales" within the meaning of Section 7 of the Act,[9] and that, therefore, Section 41 of said Act[10] is applicable and renders actual notice immaterial. Granting the premise, we cannot agree with the conclusion.

It is true that a literal reading of Section 41 indicates that where a lien arises out of a transaction amounting to a "first sale", and is not noted on an importer's or manufacturer's certificate, such lien is invalid even as between the parties and as against third persons either with or without notice. See article entitled "The Texas Certificate of Title Act," 5 Southwestern Law Journal,

9. Section 7 of the Act, as it was drawn at the time of the transactions involved in this case, read as follows: "The term 'First Sale' means the bargain, sale, transfer, or delivery [within this State] with intent to pass an interest therein, other than a lien, of a motor vehicle which has not been previously registered or licensed in this State".

10. Section 41 of the Act is as follows: "No lien shall be valid on any motor vehicle which is hereafter the subject of a first sale, or be enforceable against any such motor vehicle unless there is noted on the importer's or manufacturer's certificate the date, name, and address of the mortgagees whose rights arise out of or are incident to such first sale by reason of the execution of any written instrument by the transferee."

No. 4, 423, 431. We have found no Texas cases, however, in which said Section has been given such a construction; and, on the other hand, the Texas cases which we have read persuade us that it should not be so construed, and that in spite of its literal wording a lien arising out of a first sale is valid as between the parties and as against third persons with actual knowledge of its existence, even though it is not noted on the title documents.[11]

In Motor Investment Co. v. Knox City, 141 Tex. 530, 174 S.W.2d 482, 486, the Supreme Court of Texas held that transfers from manufacturer to dealer, from dealer to dealer, and from dealer to consumer or "owner" prior to registration were "first sales" and that liens should be noted on the manufacturer's certificate in order to charge subsequent purchasers with constructive notice thereof. In holding that the purchaser was protected in that case, however, because of the absence of a notation of a lien on the manufacturer's certificate the Court called attention to the fact that the purchaser had no "actual knowledge" of the lien. It was said in this connection: "The chattel mortgage * * * was duly registered as required by Revised Statutes, Article 5490, but no evidence of such lien was noted on the manufacturer's certificate, as provided in Section 41 of the Certificate of Title Act, and the City had no actual knowledge of the existence of such lien at the time it bought the car. It appears to have purchased the vehicle in good faith for value and without notice, except for the constructive notice * * * created by the registration of the chattel mortgage. In view of the specific provisions of Section 41 to the effect that all liens against such vehicles are void unless evidence thereof has been noted on the manufacturer's certificate, * * * the City was not charged with notice of the prior lien."

11. In the law review article above referred to, the writer, speaking of Section 41, says: "If this section is to be given literal effect, it would invalidate the lien between the parties and against third parties, with actual knowledge unless there is the required notation of the

In Nicewarner v. Alston, Tex.Civ.App., 228 S.W.2d 872, 877, the purchasers of an automobile were protected against a lien not noted on the manufacturer's certificate, and of which they had no actual notice. The Court said: "* * * appellees had no actual knowledge of the existence of such a lien, interest, or claim. There is no evidence whatever that they knew Alston had given the draft to Young nor that the manufacturer's certificate was attached to it. They purchased the car in good faith and paid a valuable consideration for it."

The two cases just referred to clearly imply, if they do not squarely hold, that Section 41 of the Act should be construed so as to protect innocent purchasers and mortgagees for value and without actual notice of outstanding claims but not so as to protect those who acquire their interests without paying value or with actual notice of outstanding claims. In this connection it is to be pointed out that in Christian v. Boyd, Tex.Civ.App., 222 S.W.2d 157, 160, the Court said that the Act provides, "the only means of preserving liens on motor vehicles as against subsequent *innocent* purchasers and lien holders". (Emphasis added.)

The construction of Section 41 implied in Motor Investment Company v. Knox City and Nicewarner v. Alston, both supra, and which we adopt, is in accord with the public policy of Texas, with regard to chattel mortgages generally, as expressed in Vernon's Civil Statutes, Articles 5489 and 5490, which provide that unregistered conditional sales contracts and chattel mortgages shall be void as against "creditors" and as against "subsequent purchasers and mortgagees or lien holders in good faith". While it is true that the Certificate of Title Act repealed Section 5490 as far as registration of liens on motor vehicles is concerned, Commercial Credit Co. v. American Manufacturing Co., Tex.

lien on the manufacturer's certificate. This construction is doubtful, particularly in view of the Texas rule that a chattel mortgage lien on personal property is good between the parties whether registered or not." 5 S.W. Law Journal, at page 431.

Civ.App., 155 S.W.2d 834, we do not perceive in the Act any manifestation of a change in the State's basic public policy toward subsequent purchasers or mortgagees of encumbered property, which policy has been to protect only those who acquire their interests in good faith, without notice, and for value; the Act is essentially a registration statute. Dublin National Bank v. Chastain, Tex.Civ.App., 167 S.W. 2d 795. In construing the Act it must be borne in mind that one of its purposes was to lessen rather than to enhance the opportunities for fraud in connection with sales and mortgages of motor vehicles, Bank of Atlanta v. Fretz, 148 Tex. 551, 226 S.W.2d 843, 849; in our opinion to adopt the construction which plaintiff would put upon Section 41 would tend to make the Act an instrument of fraud rather than a means of preventing fraud.

Not only does the construction of Section 41 which we adopt square with the general public policy of Texas, but it also brings Section 41 into harmony with Section 44 of the Act; that section provides that: "No lien on any motor vehicle to which a receipt or certificate of title has been issued shall be valid *as against third parties without actual knowledge thereof*, or enforceable against the motor vehicle of any such third parties, unless the notation of said lien shall have been caused to be made on receipts and certificates of title on said motor vehicle, as provided in this Act." (Emphasis added.) It will be seen that under this Section an unregistered chattel mortgage or lien on a vehicle upon which a receipt or certificate of title has been issued (which takes place after a "first sale") is valid as against third parties who have "actual knowledge thereof"; no valid

reason appears why there should be a distinction between subsequent mortgagees with actual knowledge of outstanding liens based upon the type of sale out of which such liens arose. The same considerations which would lead to a denial of protection to such a mortgagee where the lien grew out of a "subsequent sale" taking place after the issuance of a title certificate [12] would seem to apply with equal force to a mortgagee with actual knowledge of an outstanding lien arising out of a first sale prior to the issuance of such a certificate.

Up to this point we have accepted the plaintiff's view that the sales of all of the vehicles involved in this case by defendant to Hermansen were "first sales" within the meaning of the Act, and the plaintiff is probably correct in this view as far as the Ford and Chevrolet are concerned, since those vehicles had never been registered in any state prior to Hermansen's acquisition thereof. With respect to the Cadillacs, however, a different situation exists; those vehicles had been at one time sold to "owners" in other states, and certificates of title had been issued thereon prior to the time that Hermansen obtained them; while it is true that by virtue of Section 10 of the Act, which defines a "used car" as being a car which has been the subject of a "first sale whether within this State or elsewhere" a "first sale" may take place outside of Texas as well as within the borders of that state, we seriously doubt that the Supreme Court of Texas would have held under the Act as it was written in the spring of 1951 that an extra-state sale of a vehicle which had been registered in another state and upon which a foreign certificate of title had been issued was a "first sale".[13] It occurs to us that the con-

12. It seems that no title certificate is issued on an automobile under the Act until the vehicle has been the subject of a "first sale" and has come into the hands of an "owner", the latter being defined by Section 4 of the Act as being "any person, firm, association, or corporation other than a manufacturer, importer, distributor, or dealer claiming title to, or having a right to operate pursuant to a lien on a motor vehicle after the first sale as herein defined";

after the vehicle comes into the hands of an "owner", it must be registered and a certificate of title obtained; any sale after registration is a "subsequent sale", and an application for a certificate of title is essential to the validity of such sale. See 5 S.W. Law Journal, pp. 424–429. See also Sections 8–10, 17, 22–24, 27–30 and 33 of the Act.

13. The Texas courts clearly would not so hold under the Act as presently drawn.

cept of 'first sale" under the original Act probably included only transfers antecedent to registration whether in Texas or elsewhere, and that an out of state sale of a registered vehicle would not have been considered as a "first sale" by the Courts of Texas. See Motor Investment Co. v. Knox City, supra, 174 S.W.2d at pages 485–486. If the doubt which has just been expressed is well founded, it would follow that the sales to Hermansen of the Cadillacs were not "first sales", and that Section 41 of the Act would not be applicable to said vehicles. The construction which we have placed on Section 41, however, renders it unnecessary for us to come to a definite conclusion on this matter.

■ As heretofore stated, we are of the opinion that the plaintiff has failed to establish that it paid value for the first mortgages on the Ford and Chevrolet or for its second mortgage; this failure on its part is, in our estimation, as fatal to its claims based upon these mortgages as is the fact that on March 12th it had actual knowledge of the fact that the vehicles had not been paid for. The requirement that one who would be protected as a bona fide purchaser must have paid a valuable consideration for his interest in the property involved is coequal with the requirement that, at the time such consideration is paid, he must have no notice of outstanding claims; the absence of valuable consideration defeats the claim of bona fide purchaser as completely as does the presence of notice. This is fully borne out by the language of the Supreme Court of Texas in Motor Investment Co. v. Knox City and by that of the Court of Civil Appeals in Nicewarner v. Alston, which we have quoted.

■ It appears to be well settled in Texas that the cancellation of a pre-existing debt or the giving of credit thereon is not such consideration as will support a claim of bona fide purchaser. In this connection in 37 Tex.Jur. "Sales", Section 217 it is said that it is a well-settled principle that one who buys goods from his debtor and pays for them, not in money, but by cancelling a pre-existing debt or by giving credit thereon, is not a bona fide purchaser, this rule being based upon the theory that as the creditor pays nothing, he loses nothing and occupies no worse position than he did before; but where he changes his position to his detriment, as by releasing a lien, he is a bona fide purchaser. See also Hamilton-Brown Shoe Co. v. Lyons, 6 Tex.Civ.App. 633, 25 S.W. 805; and R. Piel Gin Co. v. Independent Farmers' Gin Co., supra. This rule has been applied to transfers of automobiles both before and since the passage of the Certificate of Title Act; Anderson v. Hall, Tex. Civ.App., 137 S.W.2d 854; Shirley-Self Motor Co. v. Canon, Tex.Civ.App., 166 S.W.2d 155; Pride v. Brandon, Tex.Civ. App., 227 S.W.2d 385. In Shirley-Self Motor Co. v. Canon, supra [166 S.W.2d 157], the Court, citing with approval 37 Tex.Jur. "Sales", Section 292, p. 639, said: "* * * a seller * * * who has for

Section 7 of the original Act defined a "first sale" as one taking place "within this State" prior to registration or licensing "in this State;" as indicated, Section 10 defined a "used car" as being one that had been the subject of a "first sale whether within this State or elsewhere"; hence it was clear that a first sale could take place either within or outside of Texas. Section 8 as originally drawn, however, defined a "subsequent sale" as being "the bargain, sale, transfer, or delivery within this State, with intent to pass an interest therein, other than a lien of a motor vehicle which has been registered or licensed within this State or when it has not been required under law to be registered or licensed in this State". Obviously, the employment of the phrase "within this State" rendered these sections of the Act ambiguous in cases involving out of state transactions. These ambiguities were resolved by the Legislature in 1951 by amending sections 7 and 8 so as to provide that a first sale is a sale "in this State or elsewhere" of a vehicle which has not been previously registered or licensed "in this State or elsewhere", and that a "subsequent sale" is the sale of a motor vehicle which has been registered or licensed "within this State or elsewhere". The amendatory act, however, did not become effective until September of 1951.

just cause rescinded the sale of his property can recover it from the buyer and also from any other person who purchased it from the buyer who does not occupy the position of a bona fide purchaser for value and that one who * * * takes the property for a pre-existing debt has no rights in the property as against the seller."

The same rule which applies to one who "purchases" property in consideration of the cancellation of or credit upon a pre-existing debt likewise applies to one who takes a mortgage on the property to secure a pre-existing debt; that is to say he is not to be considered as a bona fide purchaser for value since he has parted with no new consideration and has not changed his position to his detriment, but has, on the contrary, bettered himself. Steffian v. Milmo State Bank, 69 Tex. 513, 6 S.W. 823; Barnes v. Gray, 14 Tex.Civ. App. 439, 37 S.W. 162; Lindig v. Johnson City State Bank, Tex.Com.App., 41 S.W.2d 222. See also Overstreet v. Manning, 67 Tex. 657, 4 S.W. 248; and Bowen v. Lansing Wagon Works, 91 Tex. 385, 43 S.W. 872.

From the foregoing it appears that Texas is in accord with the general rule, as stated in 10 Am.Jur., "Chattel Mortgages", Section 206, to the effect that whereas a pre-existing debt is a valid consideration for a chattel mortgage between the parties and their privies, it is not such a consideration as will constitute the mortgagee a bona fide purchaser.

We do not think that the fundamental principle of Texas law that one who would be protected as a bona fide purchaser must have paid a valuable consideration for the property involved or for his interest therein has been affected by the passage of the Certificate of Title Act, regardless of the effect which said Act may have had on other phases of the law of automobile sales and mortgages. Rather, we are of the opinion that said principle has been re-affirmed in Motor Investment Co. v. Knox City, Nicewarner v. Alston, Shirley-Self Motor Co. v. Canon, and Pride v. Brandon, all supra.

In the instant case the plaintiff had the burden of proving that it had paid a valuable consideration for its first mortgages on the Ford and Chevrolet and for its second mortgage on the Cadillacs and the Ford.[14] As stated, its theory, as expressed in its brief, is that the consideration for the first mortgages on the Ford and Chevrolet was, in part at least, the release of liens which it then held on vehicles which Hermansen had sold. With reference to the second mortgage it contends that the consideration therefor was the renewal and extension of the indebtedness owed to it by Hermansen, based upon the bad checks which he had written. In discussing these contentions we recognize at the outset that where a mortgagee, as consideration for the mortgage, releases an existing lien or grants an extension of time within which to pay an existing debt, he has changed his position to his detriment, and, from the standpoint of value, is to be considered as a bona fide purchaser. In our opinion, however, the plaintiff has failed to prove that it released existing liens, or granted Hermansen an extension of time within which to take care of his bad checks, with sufficient certainty to enable us to find that it paid value for any of the mortgages just referred to.

In connection with the first mortgages on the Ford and Chevrolet the plaintiff does not contend that any particular existing lien was released on the strength of the first mortgage on either of these vehicles; as

14. It is a general rule of conflict of laws that the incidence of the burden of proof is to be determined by the law of the forum. 11 Am.Jur. "Conflict of Laws," Section 203; 15 C.J.S., Conflict of Laws, § 22i. It is well settled in Arkansas that where one claims to be a bona fide purchaser for value, the burden is upon him to prove that he paid value. See Bates v. Bigelow, 80 Ark. 86, 96 S.W. 125; Osceola Land Co. v. Chicago Mill & Lumber Co., 84 Ark. 1, 103 S.W. 609; White v. Moffett, 108 Ark. 490, 158 S.W. 505; Ellis v. Nickle, 193 Ark. 657, 101 S.W.2d 958; Story v. Grayson, 208 Ark. 1029, 185 S.W.2d 287; and Beloate v. Smith, 214 Ark. 884, 218 S.W.2d 361. The Texas law appears to be the same. See 37 Tex.Jur. "Sales", Sections 214 and 221, and Tillman v. Heller, supra.

will be recalled, Mr. Andry's testimony is to the effect that no particular check was allocated to any one particular account, but that the proceeds of all of the loans which Mrs. Hermansen negotiated on March 8th were lumped together and that some liens were released, and that the balance over was applied against the bad checks. Under such circumstances the plaintiff's situation is analogous to that of one who acquires personal property and, as consideration therefor, pays part in cash and part by cancelling a pre-existing debt; such a situation was before the Court of Civil Appeals in the case of Wear & Boogher Dry Goods Co. v. Crews, 23 Tex.Civ. App. 667, 57 S.W. 73. In that case the facts were that one McMeans obtained certain goods on credit from the dry goods company on the strength of a fraudulent financial statement; the value of the goods so obtained was $1,381.47. Subsequently McMeans mingled these goods in his stock in trade and transferred the entire stock to Crews in consideration of the cancellation of a $7,500 debt, and the assumption by Crews of debts of $2,336.10, of which he had paid $1,552.25 at the time that the dry goods company brought suit. The total value of the goods transferred to Crews was approximately $7,000. The Court held that the payment by Crews of cash in excess of the value of the goods in question, without notice of the fraud perpetrated by McMeans, rendered him a bona fide purchaser notwithstanding the fact that the bulk of the consideration for the transfer was the cancellation of McMeans' debt. This decision might well be in point here if the evidence showed that the plaintiff had in fact released liens of a value equal to or in excess of the amounts of the first mortgages on the Ford and Chevrolet, but the evidence does not establish such fact. Although the plaintiff might have made proof from which we could have found exactly what portion of the proceeds of the loans negotiated on the 8th was used to release existing liens and what portion was applied upon the bad checks, no such proof was made and we were furnished with no information as to the number and value of the liens released. Plaintiff relied entirely upon Mr. Andry, and the only thing to which he could testify in this connection was that "some" liens were released. Even if it be conceded that plaintiff paid value for its first mortgages on the Ford and Chevrolet to the extent that it released existing liens, still there is no evidence before us from which we can tell what that extent was.

With respect to the second mortgage loan the proceeds of which, according to plaintiff's theory, were applied to Hermansen's bad checks, there is no evidence in the record from which we can find that Hermansen's indebtedness based upon these checks was renewed or extended. When Hermansen's checks were returned by the drawee bank, the situation was that the plaintiff had an unsecured claim, based upon these checks, which was payable on demand; but, as indicated, the note for $29,426.50 which the plaintiff took on the 12th of March and which was secured by the second mortgage was also payable on demand; there is no showing here that the plaintiff in any manner parted with any security which it had for the collection of these checks or in any way changed its position to its detriment. Again we point out that the plaintiff might have made proof from which we could have found that Hermansen was granted an extension of time or received some other valuable consideration, but no such proof was made. All that we can find from the record before us in regard to the second mortgage is that it was taken as security in substitution for the liens on automobiles which the plaintiff had already lost as a result of Hermansen's bad check operations. The views just expressed with regard to the second mortgage apply with equal force to the first mortgage loans on the Ford and Chevrolet to the extent that the proceeds of such loans were applied against Hermansen's bad checks.

Plaintiff urges that because of the provisions of Sections 24 and 25 of Vernon's Annotated Civil Statutes of Texas, Article 5933 a pre-existing debt is sufficient consideration to constitute a subsequent mortgagee a bona fide purchaser for value. These sections provide, in sub-

stance, that every negotiable instrument is deemed prima facie to have been issued for a valuable consideration, that every person whose signature appears thereon is deemed prima facie to have become a party thereto for value, that value is any consideration sufficient to support a simple contract, and that an antecedent or pre-existing debt constitutes value. We cannot agree with the plaintiff in its contention in this regard; the sections of the statute which have just been referred to will be readily recognized as Sections 24 and 25 of the Uniform Negotiable Instruments Law, which has been in force in Texas since 1919; we do not think that they are applicable here. The Negotiable Instruments Law is not concerned with mortgages or liens or with priorities thereof; it is concerned with bills, notes, and checks. The problem before us is not whether the pre-existing debt of Hermansen to the plaintiff would be a sufficient consideration to support the notes which he signed, which were secured by the first mortgages on the Ford and Chevrolet and by the second mortgage which has been mentioned or to support said mortgages themselves, as between plaintiff and Hermansen; we are concerned with the relative priorities of the plaintiff's mortgages and defendant's claims to these vehicles. As pointed out, the general rule is that a pre-existing debt is not sufficient consideration to constitute the mortgagee a bona fide purchaser for value, and it is to be further noted that Lindig v. Johnson City State Bank, supra, the holding in which case was in accord with the general rule, was decided in 1931, twelve years after the Negotiable Instruments Law was adopted in Texas. Plaintiff has cited a number of Texas cases in support of this contention on its part, but none of them, except Graham National Bank v. Couger, Tex.Civ.App., 286 S.W. 657, involved any problem of bona fide purchaser for value. While Graham National Bank v. Couger apparently supports plaintiff's view that Sections 24 and 25 of the Negotiable Instruments Law have the effect of making a mortgagee who takes a mortgage to secure a pre-existing debt, without notice, either actual or constructive, of

a prior mortgage, a bona fide purchaser, we call attention to the fact that the contrary decision in Lindig v. Johnson City State Bank, supra, is a later decision by the Commission of Appeals, which was approved by the Supreme Court, and is in harmony with the general rule to which reference has heretofore been made.

There is one more section of the Certificate of Title Act to which some reference should be made before leaving this phase of the case, namely, Section 46 which provides that: "Only liens noted on a receipt or certificate of title shall be valid as against creditors of the mortgagor in so far as concerns the motor vehicle." Of course, if the word "creditors" is given its broadest connotation, it includes both prior and subsequent creditors, those who are secured as well as those who are unsecured, and those who have notice of existing liens as well as those who are innocent; furthermore, in the category of secured creditors would fall both those whose liens are based upon contract and those whose liens have attached by operation of law. The word "creditors", however, apparently has never been given such a broad definition in Texas statutes dealing with mortgages, but has been limited to those holding liens by some process of law, such as garnishment, attachment, execution, or the like; such a limitation excludes, on the one hand, general unsecured creditors, and, on the other, mortgagees and others holding contract liens. As heretofore indicated, the Texas statutes dealing with conditional sales and chattel mortgages generally are Articles 5489 and 5490 of Vernon's Civil Statutes: Section 5489 provides that all reservations of title to or property in chattels as security for the purchase money thereof shall be held to be chattel mortgages and shall, when possession is delivered to the vendee, "be void as to creditors and bona fide purchasers, unless such reservations be in writing and registered as required of chattel mortgages"; Section 5490 provides that all unregistered chattel mortgages shall be void "as against the creditors of the mortgagor or person making same, as against subsequent purchasers and mortgagees or lien holders in

good faith". In Lindig v. Johnson City State Bank, supra [41 S.W.2d 224], the Court held that under the statutes just mentioned the word "purchasers" includes chattel mortgagees, and that to be protected against an unregistered chattel mortgage, such chattel mortgagees must show that they hold "bona fide" or "in good faith", and that in order to do so they must prove not only a consideration advanced, but also that they had no notice of the unrecorded lien. In Oak Cliff College for Young Ladies v. Armstrong, Tex.Civ.App., 50 S. W. 610, the Court held that under Articles 5489 and 5490 there was a clear distinction between "creditors" and "subsequent mortgagees", and that "good faith" was required of the latter but not of the former. In Bowen v. Lansing Wagon Works, supra [91 Tex. 385, 43 S.W. 875], the word "creditors" was held to include "all persons whose claims are upon certain conditions charged by law as specific liens upon certain property, such as holders of attachment, execution, judgment, landlord and mechanics' liens, and to exclude * * * all others."

The draftsmen of the Certificate of Title Act were doubtless familiar with the rather narrow meaning given to the word "creditors" under the general statutes, and we are of the opinion that they intended for it to have the same meaning under the new law relating specifically to automobiles.[15] When Section 46 is so construed, a conflict is avoided between it and Section 44 of the Act, and there is likewise avoided the somewhat incongruous result of affording to one who merely lends money on a chattel a protection not afforded to an outright purchaser thereof. The correctness of this construction is indicated by the fact that in the rather recent case of Christian v. Boyd, Tex.Civ.App., 222 S.W. 2d 157, which was decided under the Act, the Court held in a controversy between the holder of a chattel mortgage on a motor vehicle which had not been noted on the certificate of title and one who had a mechanic's lien on the vehicle that the unregistered lien was good as between the

parties and as to any other person having notice thereof, but that since the mortgage had not been noted on the title certificate, the mechanic was not charged with constructive notice thereof. We do not overlook in this connection the fact that in the case of In re Boston, D.C.Tex., 84 F. Supp. 594, 595, the court "assumed for present purposes" that the term "creditors", as used in Section 46, meant creditors holding a lien either by contract or some process of law; the Court's assumption, however, appears to have been broader than the facts of the case called for since the creditor there involved was not a contract lien holder or mortgagee but was a trustee in bankruptcy who, under the provisions of Section 70 of the Bankruptcy Act, 11 U.S.C.A. Section 110, sub. c, was "deemed vested as of the date of bankruptcy with all the rights, remedies, and powers of a creditor then holding a lien (on property in possession of the bankrupt) *by legal or equitable proceedings*". (Emphasis added.) Moreover, in that case the parties stipulated that the Trustee had no actual notice of the labor and material claims which had been presented as secured debts. We do not feel that that Court would hold, if the question were squarely before it, that Section 46 affords protection to a subsequent mortgagee who does not occupy the position of a bona fide purchaser; nor do we think that said Section would be so construed by the Courts of Texas.

Plaintiff makes the argument that the defendant was guilty of such delay in seeking to repudiate his contract with Hermansen that he has lost all right to invalidate the sales and to reclaim the property. We cannot agree. It is true that there was a considerable delay between the times that Hermansen purchased the Ford and the Chevrolet and the date upon which the check and draft representing the purchase price of these vehicles were placed in the bank for collection, but defendant explains this delay by saying that he was waiting for the title papers on the vehicles. After the check and draft were returned

---

15. This is the view expressed in 5 S.W. Law Journal at page 431.

the first time, defendant contacted Hermansen who advised him that his difficulties had been straightened out and to send the check and draft through again, and this was done on March 7th. We do not think that these delays were unreasonable; moreover, plaintiff was in no sense prejudiced thereby since it did not negotiate loans on the Ford and Chevrolet until the 8th, and the loans were not consummated until the 12th. As to the Cadillacs, we note that Hermansen drew checks in payment for these vehicles on March 2nd; they were deposited for collection five days later, and we have found that between the 8th and the 10th defendant repossessed the vehicles. It is probably true that the defendant made some effort to get his money before he took over the cars, but we do not think that that should militate against him.

Turning now to the first mortgages on the three Cadillacs, we find that the position of the plaintiff with respect to these mortgages is materially different from that which it occupies with respect to the other mortgages involved in the case. There is no question that on or about the 28th of February the defendant delivered possession of the Cadillacs to Hermansen together with complete indicia of title, and that on the 2nd and 3rd of March the plaintiff lent $9,015 of new money to Hermansen without any actual notice of the defendant's claims, and took first mortgages on these vehicles as security therefor. It thus occupies the position of a bona fide purchaser for value and without notice unless it was charged with constructive notice of the defendant's claims.

In connection with constructive notice two questions are presented: First, was there substantial evidence to justify the jury's finding that at the times upon which the plaintiff made its original loans on these Cadillacs it had constructive notice of the defendant's claims? Second, if the finding of the jury was supported by substantial evidence, then is the plaintiff still entitled to protection in view of the sections of the Certificate of Title Act referring to "actual knowledge" on the part of third persons. The view which we take of the first question renders it unnecessary for us to discuss the second.

In discussing the first question we must, of course, view the testimony in the light most favorable to the defendant, but even when so viewed, we do not believe that there was substantial evidence justifying the finding that the plaintiff at the time it made its loans had "knowledge of facts or circumstances which would put a reasonably prudent person on such inquiry as, being made with reasonable diligence and understanding, would have led to actual knowledge of the fact that * * * such vehicles had not been paid for."

The general principles of law relating to constructive notice are familiar and require but little exposition. In Jackson v. Waldstein, Tex.Civ.App., 27 S.W. 26, 27, it was held that notice of a fact may exist without actual knowledge thereof and may be imputed by reason of knowledge of facts or circumstances which place the person having such knowledge upon inquiry which if pursued, would have led to knowledge of the ultimate fact in question. The Court quoted from the Texas Supreme Court decision in the case Wethered's Adm'r v. Boon, 17 Tex. 143, where the Court recognized that notice is of two kinds, actual and constructive, and then went on to say: "The former is said to exist where the party to be affected by it is proved to have had actual knowledge of the fact; where the knowledge of it is brought directly home to him by the evidence. * * * Or there may be constructive notice, as when the party, by any circumstances whatever, is put upon inquiry, which amounts, in judgment of law, to notice, provided the inquiry becomes a duty. (Citing authorities.) 'The general doctrine is that whatever puts a party upon an inquiry amounts, in judgment of law, to notice, provided the inquiry becomes a duty, as in the case of purchasers and creditors, and would lead to the knowledge of the requisite fact, by the exercise of ordinary diligence and understanding.' 4 Kent, Comm. 179." In the recent case of Flack v. First National Bank of Dalhart, 148 Tex. 495, 226 S.W.2d 628, 631, the Sr

preme Court said: "Notice * * * may be either actual or constructive. 'Actual notice' literally means express or positive personal information or knowledge directly communicated to the person to be affected. In a more comprehensive sense, the term also embraces knowledge of all those facts which reasonable inquiry would have disclosed, the duty of inquiring extending only to matters that are fairly suggested by the facts really known. In other words, whatever fairly puts a person upon inquiry is actual notice of the facts which would have been discovered by reasonable use of the means at hand." The Court further said: "'* * * In other words, one who has knowledge of such facts as would cause a prudent man to make further inquiry, is chargeable with notice of the facts which, by use of ordinary intelligence, he would have ascertained.'" When that case was before the Court of Civil Appeals, 222 S.W.2d 455, 458, it was said by that Court: "The known fact must be directly related to the ultimate knowledge or primary question. More fully stated, the known fact must be such as to imperatively demand that a person of ordinary care and prudence investigate to the end that the truth with reference to the ultimate fact may be disclosed." In United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 331–332, 26 S.Ct. 282, 285, 50 L.Ed. 499, the Court said: "We do not understand the law to be * * * that one who enters into an ordinary and reasonable contract for the purchase of property from another is bound to presume that the vendor is a wrongdoer, and that, therefore, he must make a searching inquiry as to the validity of his claim to the property. The rule of law in respect to purchases of land or timber is the same as that which obtains in other commercial transactions, and such a rule as is claimed by counsel would shake the foundations of commercial business. No one is bound to assume that the party with whom he deals is a wrongdoer, and if he presents property, the title to which is apparently valid, and there are no circumstances disclosed which cast suspicion upon the title, he may rightfully deal with him, and, paying full value for

the same, acquire the rights of a purchaser in good faith. Jones v. Simpson, 116 U.S. 609–615, 6 S.Ct. 538, 29 L.Ed. 742, 744. He is not bound to make a searching examination of all the account books of the vendor nor to hunt for something to cast a suspicion upon the integrity of the title."

From the foregoing authorities it appears that the plaintiff had a right to presume that Hermansen had paid for these Cadillac automobiles and to rely upon his apparent ownership thereof unless it had knowledge of facts or circumstances of such nature as would require it, in the exercise of ordinary care and prudence to initiate an inquiry as to the actual status of the titles to said vehicles. With these principles in mind we turn to the evidence.

Aside from the statement made by Hermansen to Andry at the close of the former's conversation with Miss McCargo, to which we have referred, the only evidence from which the jury could have found that plaintiff had constructive notice on March 2nd and 3rd that the Cadillacs had not been paid for was the testimony to the effect that, at widely separated intervals, checks given by Hermansen to the plaintiff to discharge liens on automobiles upon which plaintiff held mortgages, and drawn on one of the two bank accounts maintained by Hermansen, would be returned because of insufficient funds in that particular account at that particular time. We do not believe, however, that these isolated and infrequent occurrences were legally sufficient to charge the plaintiff with notice that checks given by Hermansen to his vendors would not clear in advance of the floor planning of the particular vehicles purchased. In this connection it is to be noted that Hermansen had two bank accounts, one of which, as far as the plaintiff knew up until March 8th, had never been overdrawn; and it is to be further noted that up until March 8th the checks of Hermansen, which were returned to the plaintiff, were always promptly made good. Moreover, none of the bad checks with which the plaintiff was familiar had been given to a person who had sold Hermansen a car; all had been given to the plaintiff itself to retire debts

owing to it. It is true that Mr. Andry testified, relative to these checks, as follows: "I will tell the jury we have had hot checks prior to that and he always made them good. He had this other bank account and never did have hot checks on that. He explained the other, it was just a matter of getting the deposit to the bank in time, or quick enough; that's what his explanation was. In other words, he would buy a car; he would get it floor planned with us and he didn't have time for the deposit. That was the reason why they came back on the other bank." But this testimony does not indicate that the vehicle which had been floor planned by Hermansen had been paid for by means of a bad check to be covered by the proceeds of the loan which was negotiated. On the other hand, it simply indicates that the proceeds of such loan were to have been used to cover a check given to the plaintiff, and that Hermansen had failed to deposit such proceeds in time to cover such check. While the plaintiff realized, of course, that Hermansen was depending upon it for financing, there is nothing tending to show that Hermansen was devoid of funds, or that he was operating upon a shoe string; he was doing a tremendous volume of business, and, apparently at least, was making substantial profits. It must be borne in mind that Hermansen and the plaintiff had been doing business together for four or five years prior to the dates of the transactions involved here, but there is no evidence that the plaintiff had ever had any trouble with titles on vehicles upon which it had loaned money to Hermansen; on the contrary, Hermansen himself testified that up until March 7th, everything was "as smooth as silk".

If the infrequent returns of bad checks drawn by Hermansen in plaintiff's favor had the effect of putting plaintiff on inquiry as to titles tendered by Hermansen, it had this effect not only with respect to the particular vehicles involved in this case but also with respect to all vehicles floor planned by Hermansen, which ran into hundreds if not thousands. To give the return of these checks such an effect would require the plaintiff to ignore the title documents held by Hermansen which showed that he owned the absolute and unincumbered title to the vehicles covered thereby, and to institute an independent investigation of each and every title to determine whether or not the respective vendors had been paid. To impose such a requirement upon the plaintiff, or upon any other finance company, on so slight a basis would, in our opinion, be unreasonably oppressive, and would, in effect, make it almost impossible for finance companies to operate.

As indicated, in order for a known fact to place a person upon inquiry as to an ultimate fact, the known fact must be such as would stir to inquiry a person of ordinary prudence and caution. We feel that, as a matter of law, the occasional return of Hermansen's checks, under the circumstances shown by the evidence, did not impose upon the plaintiff the duty of making inquiry with reference to whether or not cars tendered by Hermansen for floor planning had been paid for. Otherwise stated, we are of the opinion that, as a matter of law, the plaintiff's right to rely upon the certificates of title tendered by Hermansen was not affected by reason of the infrequent returns of certain of his checks on one of his two bank accounts.

The only other evidence in the record upon which the jury could have based its finding was the testimony of Hermansen relative to the statement made by him to Andry after talking with Miss McCargo. Hermansen's testimony as to what he said to Andry is indefinite and contradictory, and it appears to us that he did not recall exactly what he did say. Giving his testimony its strongest probative force, however, we do not think that his statement to Andry was legally sufficient to put the latter, as a person of reasonable prudence, on notice of the fact that Hermansen was going to give checks for these vehicles and then depend upon loans from the plaintiff to cover such checks.

While Hermansen's testimony as to the contents of this statement is contradictory and indefinite, there is one consistent note which runs through it, and that is that

whatever was said was said in a joking or "round-about" manner. While "many a true word is spoken in jest", we do not think that it can be fairly said that Hermansen's jocular, round-about, or casual remark relative to the purchase of four completely unidentified Cadillacs would so alert a man of ordinary prudence that when, two or three days later, Hermansen's wife presented, on separate occasions, title papers on three Cadillacs, which papers recited full payment of the purchase price of each vehicle and reflected no liens, he would be moved, by ordinary care and caution, to look behind said certificates. Moreover, we think that the force of this statement is still further weakened by the fact that there was nothing in it which called for any immediate investigation; the Cadillacs had not been delivered to Hermansen at the time, and no specific requests for loans thereon had been made; we do not think that the jury was justified in finding, in effect, that Andry was required to keep Hermansen's statement in his mind and to act upon it when Mrs. Hermansen brought in the titles on two Cadillacs on March 2nd and the title on a third the following day.

In his brief the defendant calls our attention to two conversations which Hermansen claims to have had with Mr. Mossler, the president of the plaintiff corporation. In connection with one of these alleged conversations Hermansen testified: "I talked to Mr. Mossler on one time about cutting down some, and he did not seem to be perturbed about the big floor plan, anything about it. Then, another time we had a few checks come back, and he told me then, he said: 'No, go ahead; you go ahead and buy. It is all right, we will take care of it.'" While we doubt that much, if any, weight could in any event be given to this conversation, the date of which was not specified, it is sufficient to dispose of it by pointing out that counsel for the defendant stated to the Court that the quoted testimony was not responsive to the question which had been asked; thereupon counsel for the plaintiff moved to strike it out, and we instructed the jury to disregard it. The other conversation referred to was, according to Hermansen, as follows: "The way I was talking to Mr. Mossler, he was talking about he was going to put me back in business, and when I was talking to him over the telephone he said he was surprised to hear about the whole thing, but for us to turn over the cars to Mr. Seamon, play ball with him. I said, 'How about the wholesalers I got checks out to, Bartlett, Valley Auto Sales, Standard Auto?' He said, 'We are not worrying about them; you take care of yourself, and to hell with them.' That is just what he said." This conversation, however, did not take place until the 9th or 10th of March, and hence it cannot be said that it afforded any notice to the plaintiff on March 2nd and 3rd when the loans on the Cadillacs were made.

Since we hold that the finding of the jury as to constructive notice was not supported by substantial evidence, and since there is no question of actual knowledge on the part of the plaintiff of defendant's claims at the times at which it made its original loans on the Cadillacs, it follows that, to the extent of these loans, the plaintiff occupies the position of a bona fide purchaser for value and without notice, and that its claims upon the Cadillacs, based upon said original loans, were superior to the rights of the defendant and should be protected. In this connection it is to be emphasized that the defendant delivered not only possession of the vehicles to Hermansen but also complete indicia of ownership, thus creating a situation which was calculated to, and did, mislead the plaintiff to its serious detriment. Under such circumstances, it would be highly inequitable to require the plaintiff to bear the loss occasioned by defendant's own negligence. As heretofore stated, defendant and his employees knew that Hermansen was a dealer in used cars, that he had bought these vehicles for resale in Texas, and that they might be sold or otherwise transferred at any time. There were several means by which the defendant could have protected himself, but he failed to utilize any of them; the plaintiff, on the other hand, without actual or constructive notice of the true situation, had no way to protect itself, except by an examination of the title papers, which showed full payment of the

purchase price of these vehicles; under the circumstances we feel that, as a matter of law, it had a right to rely upon those papers; it should be protected because it has expended its money relying upon an apparent situation, reasonably calculated to mislead it, which the defendant created. R. Piel Gin Co. v. Independent Farmers' Gin Co., supra. To hold otherwise, as to the first mortgages on the Cadillacs, would be not only contrary to the common law of Texas but would also render nugatory the Certificate of Title Act, which was clearly designed for the protection of innocent purchasers and lien holders for value and without notice.

Since the value of each of the three Cadillacs was in excess of the plaintiff's loan thereon [16], judgment will be entered for the plaintiff in the sum of $9,015, the amount of the original loans on the three Cadillacs, together with interest and costs. 9 Tex.Jur. "Chattel Mortgages", Section 72; Crawford Undertaking Co. v. Herman Siegel, Inc., Tex.Civ.App., 230 S. W.2d 590; Hodges v. Leach, Tex.Civ.App., 214 S.W.2d 837.

---

16. It was stipulated by counsel that the value of each of the three Cadillacs was $4,100.